## GALLAGHER et al. *v.* BOARD OF SUPERVISORS OF ELECTIONS OF BALTIMORE CITY et al.

[No. 245, September Term, 1958.]
(Two Appeals In One Record)

194

*Decided, per curiam, January 23, 1959.*

*Opinion filed February 18, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Francis X. Gallagher, Thomas J. Kenney* and *Morgan L. Amaimo,* for appellants.

*Charles B. Reeves, Jr., Assistant Attorney General,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for appellee, Board of Supervisors of Elections of Baltimore City.

*Joseph Sherbow,* with whom were *Carlyle Barton, M. William Adelson, Sherbow & Sherbow,* and *Weinberg & Green* on the brief, for appellee, Theodore R. McKeldin.

PRESCOTT, J., delivered the opinion of the Court.

We have, heretofore, filed a *per curiam* order affirming the action of the trial court. We now state our reasons therefor.

This is an appeal from a judgment entered by the Superior Court of Baltimore City denying the issuance of a Writ of Mandamus against the Board of Supervisors of Elections of Baltimore City, and declaring, pursuant to Article 31A of the Annotated Code of Maryland, that: (a) The Board of Supervisors of Elections of Baltimore City properly and validly accepted the certificate of candidacy of Theodore R. McKeldin for the nomination of the Republican Party for the office of Mayor of Baltimore City; (b) the Board of Supervisors of Elections of Baltimore City shall include the name of Theodore R. McKeldin on the official ballot at the primary election to be held in Baltimore City on March 3, 1959, as a candidate for the Republican nomination for Mayor of Baltimore City; (c) Theodore R. McKeldin meets the qualifications prescribed for the office of Mayor of Baltimore City by Section 7 of the Baltimore City Charter (1949 Edition) and, if elected, may lawfully hold said office.

Theodore R. McKeldin, who served as Governor of Maryland from January 10, 1951, until January 14, 1959, filed, with the Board of Supervisors of Elections of Baltimore City, his certificate of candidacy for the office of Mayor of Baltimore City in the Republican Primary Election to be held on March 3, 1959. The Board accepted the certificate, but its action was challenged by the appellants on the ground that Governor McKeldin had not been a resident of Baltimore City (sometimes hereinafter referred to as "the City") for ten years next preceding the election scheduled for May 5, 1959, as required by Section 7 of the Baltimore City Charter.

A stipulation comprising an exhaustive factual catalogue relating to nearly every phase of the activities of Governor McKeldin and his family during his tenure as Governor was admitted in evidence in the court below. In brief outline it discloses: That prior to his election as governor in 1950, Governor McKeldin was a legal voter and resident of Baltimore City; that during his two terms as governor, he did not actually live in Baltimore City, but lived, with his family, at the Government House in Annapolis; that on February 29, 1952, pursuant to an opinion issued by a former attorney general to a former governor (21 *Op. A. G.* 386) to the effect

that the former governor could not vote in Baltimore City while he was governor and because many other governors had registered and voted in Annapolis during their terms, Governor McKeldin registered as a voter in Annapolis, and thereafter voted in both state and municipal elections; that he filed his state income tax returns from 1951 through 1958, giving his residence as Annapolis; that he opened a bank account in Annapolis; that he was listed as having a home address in the Annapolis telephone directory; that he had a substantial part of his home furniture crated and stored in the Government House at Annapolis; that he changed his motor vehicle registration cards and operator's permit from his Baltimore address to Annapolis; that he applied for and was granted a non-resident membership in the Baltimore Country Club, which required the applicant to live beyond a certain radius from Baltimore City.

The stipulation further discloses: That during his tenure of office as governor, Governor McKeldin maintained 13 bank and building association accounts in Baltimore City; that he maintained a safe deposit box there, but none in Annapolis; that he was an active participating member in 31 civic, fraternal and communal organizations in the City prior to assuming the office of governor and has remained a member of each of said organizations; that while governor he actively participated in innumerable charitable campaign drives in the City, as well as making many personal contributions thereto; that he has continuously maintained a personal office in Baltimore City in addition to his official one; that while governor he purchased and sold several residential properties in the City; that, while he did not actually live in Baltimore City, he, at all times, owned a residence there; that a number of items of household furniture and furnishings were stored with members of his family in Baltimore City; that his regular physicians and dentists maintained offices in the City, where the governor and his family received treatment except in emergencies; that the governor and his wife have maintained charge accounts at all leading department stores of the City, and neither has ever had any charge accounts, other than with grocers in Annapolis; that the governor's children

were enrolled and attended the public schools of the City; that the governor, on several occasions, wrote friends stating that he intended to live in Baltimore City again as soon as his term as governor was completed; that Governor McKeldin is now a registered voter in Baltimore City; and that Mrs. McKeldin maintained her personal and social contacts and activities in Baltimore City during her husband's terms as governor.

In addition to the stipulation, both Governor and Mrs. McKeldin flatly testified that they never intended to abandon their residence in Baltimore City, but always intended to return and make their home there as soon as the governor's tenure of office had ended. And the governor testified that while he was governor, he had spent 80% of his "waking time" in the City.

In dealing with questions relating to "residence" or "domicile," or both, the intention of the party who is alleged to have had the residence or to have changed his domicile is one of the vital factors to be considered. A person's intention at any particular time is, of course, a question of fact. We recently quoted, with approval, a celebrated statement to the effect that the state of one's mind is as much a question of fact as the state of his digestion. *Tufts v. Poore,* 219 Md. 1, 147 A. 2d 717. Because of its importance and as it was the only question of fact determined by the court below, we proceed to consider the question: Does the evidence show that Governor McKeldin intended to live in Annapolis only so long as he was governor and then to return to Baltimore and live there, or does it show that he intended to live in Annapolis for an indefinite time thereafter?

The appellants contend that by the various acts set forth in the stipulation, the Governor actually, or by inference, acknowledged that he was in fact a resident of Annapolis. It would unduly prolong this opinion to consider and discuss each act and incident mentioned therein. The most emphasized of these incidents were: (a) His registration to vote in Annapolis, which was accompanied by his affidavit that he was a resident there; (b) his listing of Annapolis as his

place of residence on his income tax returns; and (c) his becoming a non-resident member of a Baltimore social club.

(a). *Registration in Annapolis.* All authorities that we have examined, except the Federal courts, and all of the previous decisions of this Court agree that the place of voting is an important factor to be considered in determining domicile, but that it is not conclusive in the absence of constitutional or legislative provisions making it so. *Harrison v. Harrison,* 117 Md. 607, 613, 84 A. 57; *Willingham v. Willingham,* 162 Md. 539, 541, 160 A. 280; *Wagner v. Scurlock,* 166 Md. 284, 292, 170 A. 539; *Shenton v. Abbott,* 178 Md. 526, 531, 15 A. 2d 906. The governor testified that in 1952 he registered in Annapolis after one of his friends told him his predecessors in the office of Governor had done so, and his idea was to conform with precedent. In regard to his voting in Annapolis, the appellants lay great stress upon Code (1957), Art. 26, Sec. 24,[1] which provides that no judge of the Court of Appeals shall be deemed to have abandoned his residence in the judicial circuit from which he shall have been elected unless he shall signify his intention so to abandon his former residence by voting in Annapolis. They argue that this is a legislative determination of what constitutes proof of intention to abandon one's prior residence and to acquire a new one by operation of law, which, when considered with the Governor's registering and voting, voluntarily, in the City of Annapolis, should be taken as overwhelming and conclusive proof of his intention to abandon his former residence.

---

1. This statute is here set out in full, as it is a classic illustration of a very short statute, wherein the term "residence" is used with two different meanings. It states:

"No judge of the Court of Appeals shall be deemed to have abandoned his residence in the judicial circuit for which he shall have been elected by reason of his residence in Annapolis during the term for which he may have been elected, unless he shall signify his intention so to abandon his residence in his said district by voting in the City of Annapolis."

There was a similar statute, (Code 1939), Art. 17, Sec. 56, relating to Clerks of the Court of Appeals. It was repealed by Ch. 58 of the Acts of 1945.

With this, we are unable to agree. We have already stated that the matter of voting is a strong and important factor to be considered with the other circumstances of each case in determining the question of intention as it relates to either residence or domicile. Perhaps, said Article 26, Section 24, makes such action by a member of the Court of Appeals conclusive so as to establish an intention to abandon the member's prior domicile; but there is no similar statutory provision with reference to the office of Governor, which leaves the law, as it relates to that office, as it was laid down in *Harrison v. Harrison* and *Shenton v. Abbott,* both *supra,* namely, that voting is a strong factor to be considered with other circumstances in determining intention, but it is not conclusive. The strength of its probative value and the weight to be given to it are dependent upon the circumstances of each individual case. In some cases it may be the highest evidence of domicile, but, when overbalanced by other circumstances, "the fact of voting may be of slight importance." *Wagner v. Scurlock, supra,* 166 Md. at page 292. See also *Willingham v. Willingham, supra.* We conclude, therefore, that the governor's voting in the City of Annapolis was an appropriate incident to be considered in determining his intention relating to his domicile, but that it was not conclusive.

(b). *Listing Annapolis as place of residence on income tax returns.* This, like the question of voting, was a proper factor to be considered on the question of intention, but it, also, was not of determinative effect.

(c). *Becoming a non-resident member of a Baltimore social club.* This, too, was a relevant incident that the court below properly considered on the question of intention. The governor testified that one of his friends told him that the waiting list of applicants for membership in the club was so long that it required several years to become admitted, that the friend suggested a non-resident membership which would become effective immediately, and, in order to permit his children to have prompt access to the facilities of the club, he became a non-resident member.

The trial judge stated that "[a]s to each of the episodes that have been mentioned, it is the opinion of the court that

the petitioner acted without the slightest thought of his action having any connection with his intention to live in Annapolis only so long as he was Governor * * *," and concluded the question of intention by saying:

> "Whatever evidence there may be to indicate the petitioner's intention to reside indefinitely in Annapolis must yield to the overwhelming evidence to the contrary. There is no evidence of any reason for the petitioner to have resided in Annapolis after he ceased to be Governor, and all of his words and actions showed his intention not to do so."

With this conclusion of the learned trial judge, we are in accord. Governor McKeldin was born and raised in Baltimore City; he practiced his profession there; there he had voted and served the City in the capacity of Mayor; and his sole purpose in going to Annapolis was to serve as Governor of the State. Without going more into detail, we think the stipulation, Governor and Mrs. McKeldin's direct statements that they never, at any time, entertained an intention not to return to Baltimore City at the expiration of his tenure of office as Governor and the other testimony, which failed to show any reason, whatsoever, for his remaining in Annapolis, conclusively show Governor McKeldin's inseparable connection, at least to the present time, with the City of Baltimore and establish that his social, personal business, fraternal, civic and religious activities and contacts were and are, again at least to the present time, inextricably interwoven with Baltimore City. In our opinion, the trial court properly decided the question of intention.

The appellants also claim that the provision of Article II, Section 21, of the Maryland Constitution, which states that "[t]he Governor shall reside at the seat of government," requires, by operation of law, the occupant of that office to sacrifice and abandon any former legal residence, and to establish a new one for political purposes; consequently, when Governor McKeldin "resided" in Annapolis during his term as governor, he did so under a constitutional mandate to abandon his previous legal residence in Baltimore.

It seems to be universally acknowledged that the words "reside" and "residence" are legal "legerdemains" of no small importance. This Court has stated that "[a]ll agree that the word 'residence' is, in itself, susceptible of different meanings," *Shaeffer v. Gilbert,* 73 Md. 66, 69, 20 A. 434, and "[t]he term residence is one which is used to signify different things." *Harrison v. Harrison, supra.* In his noted work, *The Conflict of Laws,* Professor Beale in Volume I, Section 10.3, states:

> "Residence, then, is a word which may bear different shades of meaning according to the context. It may mean something more than domicil: a domicil, namely, at which the party actually dwells. On the other hand, it may mean something less than domicil: a dwelling-place adopted for the time being, but without such an intention of permanent abode as to create a domicil there.
> "The word 'residence' is often used in statutes. When it is so used, there is room for difference of interpretation. As used in a statute, the word may mean a domicil; or it may mean a dwelling-place, which lacks the legal requirements of domicil."

There is little doubt that the terms "reside", "residence" and "domicile" have been somewhat puzzling to the Courts, textwriters and lexicographers not only in this country but throughout the world. Kennan, *Residence and Domicile,* Ch. 1. Some states have made statutory definitions of one or more of the terms; but, where there is none, all Courts seem to agree that they must be construed in accordance with the context and the purpose of the constitution, charter, statute or instrument in which they are found.

The requirement that the governor live in Annapolis while serving in that office was first contained in Ch. 131 of the Acts of 1837. It was inserted in the Constitution of 1851 and in the two succeeding ones. The appellants quote from the constitutional debates and proceedings of 1850 and claim they show an intention on the part of the framers of the

Constitution that sustains their position. We think the inference drawn from the quotations by appellants is not compelled by the debates. They show nothing that is inconsistent with the obvious purpose of the section under consideration. That purpose was the desirability of having the governor, as the Chief Executive of the State, live at the seat of the state government to promote an efficient and expeditious conduct of the State's affairs. Annapolis was and is the State Capital; there the General Assembly meets, as do other departments of the executive, judicial and legislative branches of the Government; and there much of the day to day business of the State is transacted. By requiring the Governor to live in Annapolis during his term of office, the framers of the Constitution were merely seeking to insure that the Chief Executive would be available at all reasonable times in Annapolis, and to prevent the establishment of a *de facto* seat of government in the governor's "home town."

Fortifying the above conclusion is the myriad of cases which hold that a change in residence or abode to enable a person to perform the duties and functions of a civil office not of life tenure, whether elective or appointive, does not, of itself, constitute a change of domicile. An untold number of cases could be cited to sustain this proposition; we will name only a few. In *Shenton v. Abbott, supra,* 178 Md. 526, the issue before this Court was whether a testator had abandoned his domicile of origin in Anne Arundel County and acquired a domicile of choice in Baltimore City. He was born and raised in Annapolis. For 11 years he served by appointment as a member of the Maryland Veteran's Committee and was personally in charge of its office in Baltimore from 1932 until 1935. He gave up his apartment and business office in Annapolis and took a furnished apartment in Baltimore, in which City he spent virtually all of his time when working there. For several years after 1935, he visited various friends and spent time in a number of places in the United States. After being away from Annapolis for nearly five years, except for occasional visits, he died in Florida and was buried in Arlington National Cemetery. This Court held

that he had not abandoned his domicile of origin in Anne Arundel County, and, at 178 Md. 530 stated:

> "It is a fundamental rule that, in order to effect a change of domicile, there must be an actual removal to another habitation, coupled with an intention of remaining there permanently or at least for an unlimited time. But a change of residence, to enable a person to perform the duties of a civil office, whether elective or appointive, does not of itself constitute a change of domicile. * * * Even though a person may be absent from his domicile for many years, and may return only at long intervals, nevertheless he retains his domicile if he does not acquire a domicile elsewhere."

In *Wheat v. Smith,* 7 S. W. 161 (Ark., 1888), Mr. Wheat had been elected to the office of Circuit Clerk of Lafayette County, and an effort was made to oust him from that office on the ground that he had not "resided" in the state for twelve months before his election as required by statute. It was shown he was a resident of Lafayette County in 1874, but, thereafter, he held a state office that required his residence in Washington, D. C., during the winter of 1874-1875. In the spring of 1875 he was appointed and accepted a position as consul to the Island of St. Thomas, in the Danish West Indies. He sold his homestead in Arkansas and went to the Island of St. Thomas, where he remained in the discharge of his duties until 1886. When through with his official duties he immediately returned to Lafayette County. He testified that he never intended to change his domicile. The Court recognized the principle we are now discussing and held that Mr. Wheat had not lost his domicile in Lafayette County.

In the case of *Barrett v. Parks,* 180 S. W. 2d 665 (Mo., 1944), Parks was appointed manager of a St. Louis airport, a position that required him to live without the City on the airport grounds in a house provided by the City. He had previously been a resident of the City, but an action was brought to prevent his voting there. Again, the principle

under consideration was recognized and Parks' right to vote was sustained.

The text-writers are uniformly in accord with the principle enunciated in the above cases. See Kennan, *op. cit.,* Sec. 64; Restatement, *Conflict of Laws,* Sec. 21; 1 Beale, *The Conflict of Laws,* Sec. 22.6.

In view of the obvious purpose of Article II, Section 21, of the Constitution and in the light of the authorities just mentioned, which show that the case at bar comes within a special class of cases which deal with residence by compulsion, it seems highly improbable that the framers of our Constitution intended, when they required the governor to "reside" at the seat of government, that he was to be compelled, by operation of law, to give up his original domicile. Therefore we conclude after a consideration of the context and the purpose of the constitutional provision in which it is contained, that the official residence at the seat of government required by the Constitution is that the City of Annapolis shall be the governor's temporary actual place of abode during his incumbency in that office, but that he is not compelled to give up his legal residence, unless he should so desire.

We have decided above that Governor McKeldin did not intend to abandon his domicile in Baltimore City and that he did not abandon it by operation of law. We come now to the question as to whether he is able to meet the requirement of Section 7 of the Charter that he be a "resident" of Baltimore City for ten years next preceding the election.

The appellants argue that irrespective of the Governor's intention concerning his residence or his domicile, he has not been "ten years a resident of said City next preceding the election." They claim that the word "resident" as here used means a resident in fact and in actuality as distinguished from one's domicile. Again, the term "resident" must be construed in accordance with the context and the purpose of the provision of the Charter where found. It may be safely inferred that the framers of the Charter intended to set up as a qualification for any candidate for Mayor a requirement that would reasonably assure the electorate that a candidate for

such office would be familiar with the business and governmental affairs of the City.

Upon the question being now considered, the appellants base their principal argument upon certain language used in the opinion of the early case of *Shaeffer v. Gilbert, supra,* 73 Md. 66, wherein it was stated that "residence" as a qualification for political rights should be distinguished from "domicile" in its legal or technical sense by which one's civil status and the rights of persons and property are determined, in that the object of requiring a "residence" as a qualification for the exercise of the right of suffrage was not only for the purpose of identifying the voter and as a protection against fraud, but also that the voter should become in fact a member of the community, with a common interest in all matters pertaining to government. They contend that the Court in that case did not construe the word "residence" as it is used in Article I, Section 1 of the Constitution [qualifications to vote] as being synonymous with domicile and that we should not so construe the term residence as it applies under Section 7 of the Charter.

A literal and verbal reading of the opinion in the *Shaeffer* case, alone, affords the argument some merit. However, the *ruling* of the Court was simply to the effect that an original resident of Harford County had established the fact that he had abandoned his former residence and was an actual resident of Baltimore City with a *bona fide* intention to live there for a definite or indefinite period of time, and therefore entitled to vote. We shall not discuss the case in further detail as we think subsequent decisions of this Court state what was actually decided in the case and what the term residence as a qualification to vote means, and are controlling here. In *Harrison v. Harrison, supra,* 117 Md. at page 612, the Court said: "The same term [residence] is to be found in the statute of this State relating to the right to be registered, and in *all of those cases* the construction has been uniform, giving to the term the *legal significance of domicil."* (Emphasis supplied.) The Court then held that the word residence, as used in the jurisdictional requirements under divorce statutes was the equivalent of domicile. And in *Howard*

*v. Skinner,* 87 Md. 556, 559, 40 A. 379, the Court said flatly: "Residence, as contemplated by the framers of our Constitution, for *political* or voting purposes, means *a place of fixed present domicile.*" (Emphasis partly supplied.) Again, in the later case of *Rasin v. Leaverton,* 181 Md. 91, 93, 28 A. 2d 612, the Court repeated: "The requirement in the Constitution of residence for political or voting purposes is one of a place of fixed, present domicile." The last case is of unusual import here. Most of the cases cited involved the right to vote; that case involved, as in the case at bar, eligibility to run for public office. The public office involved was that of State's Attorney for Kent County. The Constitution required that such a candidate must have "resided for at least two years in the County." Mr. Rasin's domicile of origin was in Kent County, but he had lived in Baltimore for nine years. He returned to Kent County about 15 months before the election was to be held. It was conceded that Mr. Rasin had not *actually and physically lived* in the county for a period of two years preceding the election; yet the question that this fact alone would disqualify him, as we are requested to rule in the instant case, was not even raised, either in the briefs or in the opinion. The Court clearly indicated that had Mr. Rasin retained his domicile in Kent County that he would have been eligible to seek the post he desired, but held that he had abandoned the same, and, therefore, was ineligible. These cases, some decided before and some after the adoption of the Baltimore City Charter, lead us to the conclusion that the framers of the Charter intended the residence required by Section 7 to be the equivalent of a "present, fixed domicile." This construction is consistent with the context and the purpose of the Charter provision, as anyone, who has had his "fixed, present domicile" in the City for at least ten consecutive years before an election may reasonably be expected to be familiar with the business and government thereof. If, as contended by the appellants, an actual and physical residence for the ten consecutive years prior to an election were intended, there would be few who would be eligible to seek the office, as, presumably, a vacation to Canada or Florida, serving a term as Congressman where the Con-

gressman lives in Washington, or any other actual physical absence from the City would disqualify one from seeking the office. We are unable to conclude that the framers of the Charter intended such a result.

Up to this point, we have decided that Governor McKeldin did not intend to abandon his domicile of origin; that his dwelling in Annapolis while serving as governor did not, under the provisions of Article II, Section 21, of the Constitution, require him, by operation of law, to do so; and that the residence required by Chapter 7 of the Baltimore City Charter is the equivalent of a fixed, present domicile. It only remains to be said that it is conceded that Governor McKeldin's domicile of origin was in Baltimore City and it began more than ten years ago. A person's domicile, once established, can only be changed by an actual removal to another habitation, coupled with an intention of remaining there permanently, or at least for an indefinite time. *Shenton v. Abbott, supra.* As Governor McKeldin did not intend to abandon his domicile in Baltimore City while living as governor in Annapolis, his domicile remained and is at present located in the City of Baltimore, and he is entitled to seek the office of its Mayor.

The certificate of candidacy of Governor McKeldin, when presented to the Board of Supervisors of Elections, was complete and in order on its face. The Board, by a majority vote, voted to accept the certificate. The question is raised as to whether the Board had discretionary and judicial functions to go beyond the face of the certificate and determine the eligibility of the candidate, or was the Board's duty merely ministerial. The Board, after examining the certificate of candidacy and determining that on its face it was complete and in order, was under a ministerial duty to accept said certificate and had neither a discretionary power to reject it, nor any authority to exercise the judicial function of passing upon the qualifications of the candidate. The reasons for this are fully presented in the following cases and opinions of the attorneys general, so they will not be repeated here. *Wells v. Munroe,* 86 Md. 443, 38 A. 987; *Sterling v. Jones,* 87 Md. 141, 39 A. 424; *Thom v. Cook,* 113 Md. 85, 91, 77 A. 120;

*Tawney v. Supervisors of Elections,* 198 Md. 120, 128, 81 A. 2d 209; 1 *Op. A. G.* 87; 7 *Op. A. G.* 139; 21 *Op. A. G.* 350; 24 *Op. A. G.* 297; 27 *Op. A. G.* 164.