## KATSKI, ET AL. *v.* BOEHM, ET UX.

[No. 121, September Term, 1967.]

*Decided May 1, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, McWILLIAMS, FINAN and SINGLEY, JJ.

*C. Edward Hartman, II,* with whom were *Hartman & Crain* and *Hillard P. Albert* on the brief, for appellants.

*William J. Boehm,* with whom was *Louis M. Strauss* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

William J. Boehm, who is one of the appellees here and was one of the plaintiffs below, is a member of the bar, in practice in Annapolis, Maryland. In 1954, he was instrumental in forming Bay Electric Co., Inc. (the Company) which was engaged in the electrical contracting business and from 1954 to 1963 "more or less managed and operated the business from the administrative standpoint" and was the Company's executive vice president.

At the time of the events which gave rise to this litigation, Mr. Boehm was vice president and director of Bay Electric; was receiving a salary which ranged from $50 to $200 per week; owned "eleven or twelve per cent" of the Company's stock; and acted as its counsel. The appellants Clayton O. Katski and Jane Perry Katski, who were defendants below, were the president and secretary-treasurer respectively of Bay Electric. Pre-

sumably, Mr. and Mrs. Katski owned the remainder of the Company's stock, although the record is silent on this point.

By 1963, according to Mr. Boehm's undisputed testimony "[T]he [C]ompany had progressed from a small corporation to a rather sizeable one, with contracts totaling close to $900,000. * * * All during that period of time we had our financial problems. I would advance any sums needed that the banks would not loan. Unfortunately our company did not have a good bank credit and we were unable to get money * * *."

In 1963, Mr. Boehm guaranteed a $25,000 line of credit (not here involved) from Maryland National Bank to the Company at which time his salary was increased from about $75 per week to about $150 per week.

In April of 1965, Mr. Boehm borrowed $3500 from Maryland National Bank, assigning his trust account as security, and lent to Bay Electric $3440 to cover unpaid checks for materials and payroll.

On 31 July or 1 August 1965, Maryland National Bank lent Bay Electric Company, directly, $67,000 (not here involved). As primary collateral the Bank took a security agreement from Bay Electric on all of its equipment. Mr. and Mrs. Katski and Mr. Boehm guaranteed the loan, whereupon Mr. Boehm's salary was increased to $200 per week. On about 1 October 1965, because of further financial difficulties, Mr. Boehm's salary was stopped and Mr. Katski's salary reduced to $150 a week.

In November of 1965, Mr. Boehm and his wife borrowed $13,000 from Union Trust Company and Mr. Boehm then lent it to Bay Electric to meet payrolls.

On 3 January 1966, Mr. and Mrs. Boehm borrowed another $7,000 from Union Trust Company and Mr. Boehm borrowed $20,000 from Annapolis Banking & Trust Company. Mr. Boehm lent it all to Bay Electric to meet payroll taxes for which he, with other officers of the Company, was indirectly responsible.

In August, 1966, Mr. Boehm learned that a check not covered by sufficient funds had been issued by Bay Electric for $18,000 to pay employees' withholding and social security taxes. Mr. Boehm, who feared that he was again responsible for such

taxes and possibly subject to criminal indictment for non-payment, borrowed $18,000 from Maryland National Bank and lent it to Bay Electric to cover the checks. The earlier security agreement on equipment which had secured the $67,000 loan (by then reduced to $38,000) was re-executed to cover the $38,000 and the $18,000 and, as additional security, Mr. Boehm obtained for Maryland National Bank an assignment of Bay Electric's earned contract retainages, totaling $72,000.

At the same time, Mr. Boehm noted that the Maryland National Bank security agreement did not cover Bay Electric's inventory valued at about $35,000. Mr. Boehm as trustee took from Bay Electric a chattel mortgage for $30,000, as security for Mr. and Mrs. Boehm's $20,000 Union Trust loan and his $20,000 Annapolis Banking & Trust loan.

No notes were ever taken by Mr. Boehm from Bay Electric, the only evidence of indebtedness being recorded on the books of account of Bay Electric.

Mr. Boehm made inquiry of Mr. Katski in November, 1966, and was told that contract retainages were $75,000, and that Mr. Boehm's loans from the various banks had been reduced by Bay Electric as follows: the Annapolis Banking & Trust loan from $20,000 to $15,000; the Union Trust loan from $20,000 to $19,000, and the Maryland National Bank loan from $18,000 to $12,000.

On 11 December 1966, a fire occurred at the Bay Electric plant, destroying all of the inventory subject to Mr. Boehm's security agreement as well as several buildings owned by the Katskis.

This was the situation on 23 December 1966, when Mr. Boehm met with Mr. and Mrs. Katski and Kenneth L. Dunn, the Company's accountant, at the Katskis' residence. After a discussion, Mr. Boehm prepared and presented to Mr. and Mrs. Katski, in their capacity as officers of Bay Electric, five confessed judgment notes, all payable on demand:

(1) $3500 payable to Maryland National Bank and William Boehm, Trustee, as co-payees.[1, 2]

---

1. This note apparently related to the loan made by Maryland National to Mr. Boehm in April, 1965.

(2) $9000 payable to William Boehm as sole payee.[3]

(3) $19,000 on a printed Union Trust Company form payable to William J. Boehm, Dorothy H. Boehm and Union Trust Company, as co-payees, with interest at 10% per annum.

(4) $12,000 on a printed Maryland National Bank form payable to Maryland National Bank as sole payee.

(5) $15,000 on a printed Annapolis Banking & Trust Co. form [4] payable to Annapolis Banking & Trust Co. and William J. Boehm, as co-payees.

These notes were then endorsed by Mr. and Mrs. Katski in their individual capacities and delivered to Mr. Boehm. At this point, Mr. Boehm resigned as an officer, director and attorney of Bay Electric, delivered his stock in the Company to Mr. and Mrs. Katski, and accepted their check for $25, in payment for the stock.

On 27 December 1966, the Katskis went to Mr. Boehm's office and delivered to him a signed and partially completed assignment of certain insurance proceeds which was intended to guarantee the payment of the notes which Mr. Boehm proposed to give to the banks.

Mr. Boehm then visited the banks, and found them unwilling to accept the Bay Electric notes, endorsed by the Katskis, in substitution for the notes signed by himself or his wife and himself, but the banks did agree to renew the loans evidenced by the Boehm notes provided that monthly payments were made. Mr. Boehm then returned to his office, described the situation to the Katskis, advised them that he would have to hold the notes, and made the following changes:

(1) On the $3500 note he struck out Maryland National Bank as co-payee, leaving himself as sole payee.[5]

(2) On the $19,000 note he struck out Union Trust Company as co-payee, leaving himself and his wife as co-

---

2., 3. The judgments later entered on these notes were vacated, and they are not involved in this appeal.

4. This note, although not stated to be payable on demand, was so treated by the parties and the lower court, perhaps in reliance on Uniform Commercial Code (U.C.C.), § 3-108.

5. See, fn. 2, supra; fn. 7, infra.

payees, and changed the interest rate from 10% to 6%.

(3) On the $12,000 note he struck out Maryland National Bank as sole payee and substituted himself as sole payee.

(4) On the $15,000 note he struck out Annapolis Banking & Trust Company as co-payee, leaving himself as sole payee.[6]

When the monthly payments were not made, on 17 January 1967 Mr. and Mrs. Boehm caused a confessed judgment to be entered against Bay Electric and the Katskis on the $19,000 note and Mr. Boehm on 18 January 1967 had similar judgments entered on the $12,000 note and the $15,000 note. Motions to vacate the judgments were filed by the Katskis and by the trustee for the creditors of Bay Electric, who had been granted leave to intervene as a defendant.

From orders denying the motions to strike the judgments entered on the $19,000, $15,000 and $12,000 notes [7] this appeal was taken.

The appellants' motions to vacate the judgments were filed under Maryland Rule 645 b which provides that "* * * the clerk shall issue a summons to the defendant notifying him of the entry of the judgment and requiring him to appear in the cause * * * and show cause, if any he has, why the judgment should be vacated, opened or modified."

---

6. This is conceded by appellants in their brief, page 8, although an examination of the note discloses that "Annapolis Banking & Trust Company" was stricken where it appeared in print, but not where it had been inserted in Mr. Boehm's handwriting. Presumably, the parties and the court concluded that it was Mr. Boehm's intention to strike the bank's name in both places.

7. The record shows that judgments on the $9,000 and $3500 notes referred to in the statement of facts were vacated, and the cases were set down for trial, but that the liens were retained. The court also granted motions to strike the 15% attorney's fee provided for in the notes for $19,000, and $12,000, and the 10% attorney's fee provided for in the $15,000 note, since Mr. Boehm as payee and holder was not represented by an attorney. *See*, Weiner v. Swales, 217 Md. 123, 141 A. 2d 749 (1958). These questions are not before us in the present appeal.

The Katskis assigned the following grounds for their motions:

I. That the execution of the notes by Bay Electric was without consideration.

II. That the Katskis' endorsement of the notes was without consideration.

III. That Mr. Katski was incompetent at the time of the signing of the notes.

IV. That Mr. Boehm was guilty of a breach of fiduciary relationship.

V. That no demand was made on the Katskis.

VI. That certain of the notes were payable to payees other than Mr. Boehm, or Mr. Boehm and his wife.

The trustee for the creditors of Bay Electric adopted grounds I and VI in his motion and modified grounds III and V to make them applicable to Bay Electric as maker.

After a protracted hearing at which testimony was taken, the lower court denied the motions to vacate the judgments entered by confession on the $19,000, $15,000 and $12,000 notes.[8] The present appeal was taken from these orders.

Judge Offutt, speaking for our predecessors in *Keiner v. Commerce Trust Co.,* 154 Md. 366, 370-71, 141 A. 121 (1927) described the Maryland practice with respect to the vacating of confessed judgments:

> "A judgment by confession possesses all the incidents, is supported by the same presumptions, and is entitled to the same faith and credit, as any other judgment (*Freeman on Judgments,* par. 1337), and that is so whether the confession is by the defendant in person or by another with his consent. *Ibid.* But while that is true, the widespread and general practice of embodying, in promissory notes, warrants of attorney authorizing a confession of judgment for the amount thereof, together with counsel fees, lends itself too readily to fraud and abuse, and in this state at least such judgments 'are freely stricken out on motion to let in de-

---

8. *See,* fn. 7, *supra.*

fenses.' *Phillips v. Taylor,* 148 Md. 162. And although such a motion 'must be supported by satisfactory proof of conditions which make such action necessary to serve the ends of justice' (*Wisner v. Reeside,* 139 Md. 223), the court in dealing with it 'should be very careful to see that no improper advantage has been taken of the maker of such note in entering judgment' *International Harvester Co. v. Neuhauser,* 128 Md. 181.

"Necessarily, one making the motion assumes the burden of supporting the facts alleged in it, and as to all matters not going to the merits of the controversy, such as surprise or deceit in the entry of the judgment itself, he must prove such facts by a fair preponderance of the evidence. But as to defenses going to the merits of the claim upon which the judgment rests, a different rule prevails. In such cases, if the evidence adduced in support of the motion is sufficient to persuade the fair and reasoned judgment of an ordinary man that there are substantial and sufficient grounds for an actual controversy as to the merits of the case, the defendant should be deemed to have met the burden of showing that he has a meritorious defense. In other words, if the evidence is such that persons of ordinary judgment and prudence could honestly and fairly draw different inferences from it, one favoring the plaintiff and the other the defendant, the court should not itself decide that conflict, but should submit it to a jury. And while the rule thus stated is not universally approved, it seems to be supported by the weight of authority, is consistent with justice and equity, and is in harmony with the decisions of this court. 'Courts of law exercise an equitable jurisdiction over judgments entered by confession upon notes and warrants of attorney, and it is necessary to justice that they should liberally exercise that jurisdiction, and may therefore, on application of the defendant, vacate them and permit him to make a defense on the merits, provided the

proper showing of a meritorious defense is made.'
*Freeman on Judgments,* par. 1340. 34 *C.J.* 415;
*Wisner v. Reeside, supra; International Harvester Co.
v. Neuhauser, supra; Phillips v. Taylor, supra."*

The rule has been recently restated by Judge (now Chief
Judge) Hammond in the opinion of the Court in *Stankovich
v. Lehman,* 230 Md. 426, 432, 187 A. 2d 309 (1963) :

> "To be successful in moving to strike a judgment
> by confession, one must adduce evidence in support of
> his motion sufficient to persuade the fair and reasoned
> judgment of an ordinary man that there are substantial
> and sufficient grounds for an actual controversy as to
> the merits of the case. If he does so, he is deemed to
> have met the burden of showing he has a meritorious
> defense, without the necessity of showing he will even-
> tually prevail. This is to say that if the evidence is
> such that persons of ordinary judgment and prudence
> could fairly draw different inferences from it, the con-
> troversy should not be decided as a matter of law but
> instead should be submitted to a trier of fact. If a
> meritorious defense is made out (by affidavits or testi-
> mony, *Johnson v. Phillips, supra*), the Court should
> liberally exercise its equitable jurisdiction over judg-
> ments entered by confession and, on application of a
> defendant who prima facie shows such defense, vacate
> the judgment to permit a trial on the merits. *Cropper
> v. Graves,* 216 Md. 229; *Remsburg v. Baker,* 212 Md.
> 465, 470; *Keiner v. Commerce Trust Co.,* 154 Md.
> 366, 370-371."

The lower court concluded that the appellants failed to meet
the burden of the rule which required them to adduce evidence
from which persons of ordinary judgment and prudence could
fairly draw different inferences, which would have the con-
sequence that the controversy should not be decided as a
matter of law, but should be submitted to a trier of fact. We
agree that the appellants did not meet this burden and pro-

ceed to a detailed consideration of their contentions and an analysis of the testimony offered to support them.[9]

## I.

*The execution of the notes by Bay Electric was without consideration.*

Testimony that the notes were for amounts previously borrowed by Mr. Boehm or Mr. Boehm and his wife and made available to Bay Electric was uncontroverted. As a matter of law, no consideration is necessary for an instrument given in payment of or as security for an antecedent obligation of any kind. Uniform Commercial Code (U.C.C.), § 3-408; Maryland Code (1957, 1964 Replacement Volume) Art. 95B, § 3-408; 11 Am. Jr., *Bills and Notes,* § 229.

## II.

*The Katskis' endorsement of the notes was without consideration.*

Consideration can be found, as a matter of law, since the interest of the Katskis, as officers and stockholders of Bay Electric, and (as Mrs. Katski testified) their desire to keep the Company in business were sufficient to support their endorsement. *Gordon v. State National Bank of Bethesda,* 249 Md. 378, 239 A. 2d 915 (1968) ; *Foland v. Hoffman,* 186 Md. 423, 47 A. 2d 62 (1946) ; *Crothers v. National Bank,* 158 Md. 587, 149 A. 270 (1930) ; *New v. Page,* 144 Md. 606, 125 A. 403 (1924).

## III.

*Mr. Katski was incompetent at the time of the signing of the notes.*

Offered in support of this contention was Mrs. Katski's testimony that Mr. Katski had been ill with a respiratory infection following the fire of 11 December 1966, "had been under a lot of strain," "was very nervous," "had been to the doctor several times." The Katskis' physician, who saw Mr. Katski

9. The confessed judgment notes here involved are negotiable instruments within the definition of the Uniform Commercial Code and are subject to the provisions of Art. 3 of the U.C.C. Maryland Code (1957, 1964 Replacement Volume) Art. 95B, § 3-104.

on 12 December and 19 December, testified that Mr. Katski was "upset," "anxious" and "distraught," and prescribed large doses of Thorazine, which he described as "a combination drug containing a tranquilizer and anti-depressant" and "specifically advised [Mr. Katski] not to make [business] decisions." However, on further cross examination, the physician admitted that Katski, although "distraught, despondent, dejected," "was not disoriented." Also of significance is Katski's own testimony that he left the 23 December meeting, to personally photostat the notes which he and his wife had signed, which was confirmed by the Company's accountant, Kenneth L. Dunn, and that he wrote the $25 check given for Mr. Boehm's stock.

Under the proper circumstances, the U.C.C. allows incompetency to be raised as a defense against the holder of a note. Code (1957, 1964 Replacement Volume) Art. 95B, §§ 3-305, 3-306. The lower court found, however, that the testimony did not establish incompetency as a matter of law, and we agree. Physical distress, debility or pain will not support an inference of mental incapacity unless so severe as to render a person unable to comprehend the nature of his act and its consequences. *Mead v. Gilbert,* 170 Md. 592, 185 A. 668 (1936); *See also, Lynn v. Magness,* 191 Md. 674, 62 A. 2d 604 (1949). No such inference can be drawn here.

## IV.

*Mr. Boehm was guilty of the breach of a fiduciary relationship.*

The thrust of this argument, that an attorney-client relationship existed between Mr. Boehm and the Katskis, finds no support in the testimony. In her direct examination, Mrs. Katski was asked the question, "Can you tell the Court if Mr. Boehm was the lawyer for you and Mr. Katski and for Bay Electric?" and answered, "Yes, he was." In response to the question, "And how long had he been?" she said, "I would say since 1949-1950, approximately twelve or thirteen years." Mrs. Katski was then asked, "Had Mr. Boehm also been connected with Bay Electric Company in any way?" and she replied, "Yes, he helped to form the corporation." However, on cross examination Mrs. Katski admitted that "about five times" she had "bought property and signed notes and mortgages indi-

vidually" and was represented by an attorney, who was not identified, and then, in answer to the question, "Now, you say Mr. Boehm was your personal attorney or attorney for the Bay Electric?" replied, "He was an attorney for Bay Electric, if the need be, he handled personal things. He did not really handle anything personal for me because I'd never had anything come up personally." Later, when pressed with respect to the misrepresentation alleged to have constituted a breach of the fiduciary relationship, Mrs. Katski alluded to a statement made by Mr. Boehm with respect to two notes in amounts of $9,000 and $3,500 which are not before us in the present case.

The lower court correctly found no evidence of a fiduciary relationship.

## V.

*No demand was made on the makers and endorsers.*

The trial court found that

> "Demand was made by William J. Boehm in January, 1967 while the Defendants were in his office and at that time, the Defendants were unable to pay the interest or principal payment on same. At that time the Defendants were informed that in view of the fact payment was not forthcoming, the notes would be reduced to judgment."

U.C.C. (Code, Art. 95B), § 3-504(1) defines presentment as "a demand for acceptance or payment made upon the maker, acceptor, drawee or other payor by or on behalf of the holder" and the official Comment indicates that the rules regarding presentment have been simplified "to make it clear that any demand upon the party to pay is a presentment, no matter where or how." §§ 3-501(1)(b) and 2(a) provide that presentment for payment and notice of dishonor, unless excused, are necessary to charge an endorser but § 3-511 2(a) provides that presentment or notice is entirely excused if waived by the party to be charged. Since each of the notes before us contains such a waiver, the court could have properly found, as a matter of law, that no demand or notice of dishonor was required.

## VI.

*Certain of the notes were payable to payees other than Mr. Boehm or Mr. Boehm and his wife.*

This issue has two aspects: First, was Mr. Boehm authorized to strike the names of the banks from the three notes? Second, if his action was unwarranted, can judgment be entered in actions in which the banks as co-payees, did not join?

The appellants contend that the unilateral action of Mr. Boehm in striking the names of the banks was a material alteration which releases the maker and endorsers and rely on U.C.C., § 3-407. They then argue that U.C.C., § 3-116 provides that an instrument payable to two or more persons, not in the alternative, can only be enforced by all of them. The appellee contends that the change was made by Mr. Boehm, in the presence of the Katskis, on 27 December 1966, with their consent and agreement, and while this does not appear to be disputed, it is unsupported by testimony.

The court below made the following finding:

"The evidence presented clearly showed that the Defendants did not enter into any agreement with any banks, or procured any sums of money from the banks, or delivered any of the executed notes to any of the banks, nor intended to deal with any bank. There was no dispute that the Plaintiffs were holders of the notes. The Plaintiffs obtained the money from the bank and loaned same to the Defendants. There was no obligation to the bank by any of the Defendants nor was the bank a party to any of the Agreements for indemnification of the Plaintiffs. The banks could not maintain any suit on the notes as they were not a real party in interest."

We are not inclined to disturb this finding, which is supported by the evidence, Maryland Rule 886; *Hall v. Morris*, 213 Md. 396, 132 A. 2d 113 (1957); *Taylor v. Wesley Freeman, Inc.*, 186 Md. 474, 47 A. 2d 500 (1946), and the conclusion finds support in Maryland Rule 203 a, which requires that an action shall be prosecuted in the name of the real party in interest.

The court below might also have found, as a matter of law, that the alteration made in the notes by Mr. Boehm did not discharge the maker or endorsers, and that the obligations could be enforced by Mr. and Mrs. Boehm, or by Mr. Boehm without the joinder of the banks, despite the provisions of U.C.C., § 3-116 that an instrument payable to two or more persons, not in the alternative, may only be enforced by all of them.

§ 3-407 of the U.C.C. provides:

"(1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in

(a) The number or relations of the parties; or

(b) An incomplete instrument, by completing it otherwise than as authorized; or

(c) The writing as signed, by adding to it or by removing any part of it.

(2) As against any person other than a subsequent holder in due course.

(a) Alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense;

(b) No other alteration discharges any party and the instrument may be enforced according to its original tenor, or as to incomplete instruments according to the authority given."

Since Mr. Boehm was not a *subsequent* holder in due course, the maker and endorsers are not discharged unless Mr. Boehm's act was both material *and* fraudulent. Fraud, concededly, does not come into play here, and materiality hinges on whether there is a change in the contract of those who have signed. Whether the maker and the endorsers are obligated to one payee, two payees or three is not, in our view, material: The contract was to repay a certain sum, at a certain time, and a certain rate of interest. Admittedly, the banks, had their names not been stricken, could have assigned their interest to Mr. Boehm; and conversely, Mr. Boehm and the banks could have

negotiated the notes with any number of persons. The official Comment to § 3-407 suggests that an alteration made by the holder, reducing the rate of interest (Mr. Boehm did this in the case of the $19,000 note) is not a material alteration. *Epstein v. Paskow & Epstein,* New York Supreme Court, New York County, 4 U.C.C. Rep. Serv. 1066 (1968) holds that the insertion of "6%" in a note providing that it was payable "With Interest" was not a material alteration under § 3-407; and *Navitsky v. Gregas,* Ct. Com. Pleas, Schuylkill Co., Pa., 39 Pa. D. & C. 2d 143, 3 U.C.C. Rep. Serv. 817 (1966) holds that § 3-407 did not apply to the addition of the words "or assignee" to the endorsement after it had been signed, since the alteration had no effect on the obligation of the maker to pay the note. *See also, Poelcher v. Zink,* 375 Pa. 539, 101 A. 2d 628 (1954), holding that erasure of the amount stated in figures was not a material alteration where the amount stated in words remained.

Even apart from the argument that the appellants consented to the striking of the names of the banks, we conclude that as a matter of law the alteration was neither fraudulent nor material and that the notes may be enforced according to their tenor, as altered.[10] It follows that Mr. and Mrs. Boehm and Mr. Boehm could maintain the action without the joinder of the banks.

Under Rule 645 b, on motion duly made to vacate a confessed judgment, the lower court shall take such action "as justice may require." We have held that the court's discretion shall be liberally exercised. *Leahy, Executrix v. McManus,* 237 Md. 450, 454, 206 A. 2d 688 (1965); *Remsburg v. Baker,* 212 Md. 465, 129 A. 2d 687 (1957) and cases cited therein. In the usual case, the elements of defense are made out in affidavits and if these amount to a prima facie defense or disclose an apparent conflict in evidence as to the merits of the case, the court should liberally exercise its equitable jurisdiction, vacate the judgment, and permit a trial on the merits. *Plitt v. McMillan,* 235 Md. 349, 353, 201 A. 2d 787 (1964); *Stankovich*

---

10. See U.C.C., § 3-407, official Comment 3.d., which points out that where blanks are filled in, "there is no original tenor."

*v. Lehman,* 230 Md. 426, 432, 187 A. 2d 309 (1963) ; *Johnson v. Phillips,* 143 Md. 16, 122 A. 7 (1923).

In the case before us, the appellants elected to support their motions with oral testimony. In the argument of the case before us, it was suggested by counsel for the appellee, and we are inclined to agree, that the court had before it all of the evidence which would have been adduced in a trial on the merits. From our review of the testimony, we are of the opinion that there were no issues of fact which should have been submitted to the trier of facts; that the controversy could be decided as a matter of law; and that when the court denied the motions, it "took such action as justice may require", in the language of the Rule.

*Orders affirmed; costs to be paid by appellants.*