**Benjamin GAFFIN**

v.

**Paul HEYMANN.**

**No. 78–436–Appeal.**

Supreme Court of Rhode Island.

April 23, 1981.

---

William Y. Chaika, Pasco F. Loffredo, Cranston, for plaintiff.

John F. McDonough, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is a suit on a promissory note that bears the signature of the defendant, Paul Heymann (Heymann). The place where Heymann's signature appears presents a somewhat novel question. Heymann is before us on an appeal from a judgment entered against him subsequent to a jury-waived trial in the Superior Court.

The record indicates that in the latter part of 1967, plaintiff Benjamin Gaffin (Gaffin) was persuaded to lend his son, Erwin, and Heymann's son, Michael, $10,000 so that the sons could open and operate a travel agency in Massachusetts. The business did not prosper, and in February 1968 the agency terminated operations. Shortly thereafter Gaffin informed Heymann's son, Michael, that he wanted the loan repaid or he would initiate legal proceedings against the remaining assets of the corporation, two automobiles. Michael told Gaffin that he wished to retain possession of the two automobiles and would give Gaffin a promissory note equal to the amount of the loan if Gaffin agreed that Michael could keep the automobiles. On February 16, 1968, a $10,000 promissory note was delivered to Gaffin by Michael. Gaffin rejected the note because he felt that Michael was incapable of

meeting the obligation and informed Michael that he would only accept a note that had been cosigned or endorsed by a third party.

On March 10, 1968, a note for $8,000 with payment due on March 3, 1973, and providing for interest at the rate of 10 percent per annum, was mailed to Gaffin by Michael. On the back of the note appears the signature of Michael's father. Accompanying the note was a slip of paper which indicated interest was to be paid on a $10,000 note in monthly installments. At this time Gaffin also received from Michael a second note. It was in the amount of $2,000. Gaffin testified it was his understanding that the reason he was given two notes totalling $10,000 instead of one was that Michael's father wanted to limit his liability to $8,000.

On March 25, 1968, Gaffin received two payments from Michael purportedly representing interest payments. One of the checks "bounced." Gaffin testified that he was unable to locate Michael, and on August 12, 1968, he wrote to Heymann seeking the interest payments. Three days later Heymann responded with a letter dated August 15, 1968, in which he said he had signed the note as an endorser and not as a comaker. He also informed Gaffin that he considered the endorsement to be null and void because Michael and Gaffin had supposedly made a "new deal." Subsequently, Gaffin received letters from Michael which reported that his financial status was improving and that payments would be forthcoming.

However, no further payments were received by Gaffin, and his attempts to locate Michael through his father and the telephone directory proved fruitless. Thus, on October 7, 1977, Gaffin conveyed notice of dishonor to Heymann and demanded payment. Thereafter, the parents became embroiled in litigation.

Many of the issues raised by Heymann on this appeal relate to the trial justice's rulings in permitting into evidence correspondence and the various promissory notes to which we have alluded. Heymann contends that the admission of these documents vio-

lated the hearsay rule. Even if we were to assume that some of the trial justice's rulings in this area were erroneous, Heymann has failed to establish that any of the evidence to which he presently objects "reasonably tended to exert an influence upon the determination of the real issue in the case * * *." *Mercurio v. Fascitelli,* 116 R.I. 237, 244, 354 A.2d 736, 740 (1976), *quoting Heuser v. Goldstein,* 107 R.I. 317, 321, 267 A.2d 420, 422 (1970). We have scrutinized all of the exhibits at issue, and it is our firm belief that, even if excluded, this evidence would not have affected the outcome of this case.

In finding for Gaffin, the trial justice observed that Heymann's liability could not be determined by reference solely to the location of his signature on the note, but such a determination could only be had after an examination of the circumstances surrounding the signing of the note. Consequently, the trial justice, after evaluating the evidence, concluded that Heymann had signed the note in the capacity of a comaker because Gaffin wanted some assurance that the note would be paid when due.

This court has previously spoken on what principle is to be applied when determining the status of one who signs a promissory note in an ambiguous capacity. In *Deahy v. Choquet,* 28 R.I. 338, 67 A. 421 (1907), the situation was similar to the one presently before us. There, the status of the parties was resolved by relying on a provision in the Negotiable Instrument Act which provided that, unless a contrary intent was clearly indicated by appropriate language, one who places his signature upon a note other than in the capacity of drawer, maker, or acceptor would be considered to be an endorser.[1] *See also Costello Bros., Inc. v. Buckley,* 50 R.I. 432, 148 A. 414 (1930); *National Exchange Bank v. Lubrano,* 29 R.I. 64, 68 A. 944 (1908). Our holding in *Deahy* that the defendants there were endorsers and not makers is an appropriate

response to Gaffin's argument that he would not have accepted the note but for the value Heymann's signature gave it, and as was stated in *Deahy:*

> "The claim that the endorsers are liable as makers because the plaintiff required good endorsers before he would discount the note is the height of absurdity. If it were valid every endorser whose name was of any value would be held as a maker." *Deahy v. Choquet,* 28 R.I. at 340, 67 A. at 422–23.

Although this facet of the Gaffin-Heymann imbroglio is governed by the provisions of the Uniform Commercial Code, specifically, G.L. 1956 (1969 Reenactment) § 6A–3–402, this particular statute is essentially a recodification of art. VI, sec. 71, of the Negotiable Instrument Act and provides little basis to change the position expressed in *Deahy.* To the contrary, the comment to § 6A–3–402 makes it abundantly clear that, when at all possible, these determinations should be reached only by reference to the instrument itself.

> "The revised language is intended to say that any ambiguity as to the capacity in which a signature is made must be resolved by a rule of law that it is an indorsement. Parol evidence is not admissible to show any other capacity, except for the purpose of reformation of the instrument as it may be permitted under the rules of the particular jurisdiction. The question is to be determined from the face of the instrument alone, and unless the instrument itself makes it clear that he has signed in some other capacity the signer must be treated as an indorser."

■ Here, Heymann's signature appears on the back of the note without any indication of why Heymann selected this location to affix his signature to his son's note. We see no reason to depart from the principle announced in *Deahy.* This principle has been applied in a similar manner in many

---

1. Article VI, section 71, of the Negotiable Instrument Act, P.L. 1899, ch. 674, states:

   "A person placing his signature upon an instrument otherwise than as maker, drawer, or acceptor is deemed to be an endorser unless he clearly indicates by appropriate words his intention to be bound in some other capacity."

other jurisdictions. *See First New Haven National Bank v. Clarke*, 33 Conn.Sup. 179, 368 A.2d 613 (1976); *Lesser v. Todd Cigarette Service Co.*, 267 Md. 524, 298 A.2d 151 (1973); *Mechanics National Bank of Worcester v. Shear*, —— Mass.App. ——, 386 N.E.2d 1299 (1979); *King v. Finnell*, Okl., 603 P.2d 754 (1979). *Cf. United Bank and Trust Co. of Maryland v. Schaeffer*, 280 Md. 10, 370 A.2d 1138 (1977) (fraud used to acquire signature); *O'Grady v. First Union National Bank*, 296 N.C. 212, 250 S.E.2d 587 (1978) (signed in place regularly reserved for maker—ambiguity dispelled). Therefore, we conclude that Heymann's liability is that of an accommodation endorser and not that of a maker.

■ An endorser's liability attaches only after presentment and demand has been made on the maker, in this instance, Michael. *See* G.L. 1956 (1969 Reenactment) § 6A-3-501. After the maker has dishonored the note, the endorser is required to pay the instrument according to its tenor at the time he signed it. Unless excused, failure to make presentment to the maker will act to discharge the endorser. *See* § 6A-3-502. Heymann argues that since Gaffin has acknowledged he did not present the note to Michael when due, he has been discharged of his obligation to pay. Gaffin has countered this contention by claiming that presentment was waived by Michael.[2]

Once Michael delivered the note to Gaffin, he left Massachusetts to live in Rhode Island. After living in Rhode Island for an indeterminate period, he traveled abroad. Heymann told the trial justice that although he had spoken frequently to Michael on the phone since his return to the United States, he was unaware of Michael's address or place of employment. According to his father, Michael, at the time of trial, was residing somewhere in Connecticut.

■ In ruling that Gaffin had exercised reasonable diligence in attempting to locate Michael, the trial justice noted that Michael had not responded to mail addressed to him at his last-known address and had not responded to phone messages left at his father's residence. Although these attempts to reach Michael occurred prior to the due date of the note, the trial justice implied that had Gaffin made further efforts after March 10, 1973, they too would have failed. In view of the fact that Heymann was aware that Gaffin had attempted to contact Michael and that these attempts had been unsuccessful, there would be little to be gained by requiring Gaffin to continue his attempts ad infinitum. This is particularly true when the endorser is in a better position to know the location of the maker than is the payee of the note. Hence, we cannot fault the trial justice's finding that Gaffin had indeed exercised due diligence in attempting to locate Michael. *See, e. g., Federal Deposit Insurance Corp. v. Kirkland*, 272 S.C. 310, 251 S.E.2d 750 (1979).

■ Heymann also maintains that the instrument was altered by his son, and as a result the father is discharged from paying. When a party signs a negotiable instrument, his obligation is to pay in accordance with the terms expressed in the note. A subsequent material alteration in the terms of the note without the agreement of the endorsing party may act as a discharge. *See* G.L. 1956 (1969 Reenactment) § 6A-3-407. Even if we assume that Michael did attempt to alter the note so as to require monthly interest payments, we are unable to agree that this action by itself will result in a discharge under the provisions of § 6A-3-407.

To be entitled to a discharge based upon improper alteration of a note, the alteration must be both material and fraudulent. *See* § 6A-3-407(2)(a) and (b);[3] *Bluffestone v.*

2. General Laws 1956 (1969 Reenactment) § 6A-3-511(2) states in part: "Presentment or notice or protest as the case may be is entirely excused when * * * (c) by reasonable diligence the presentment or protest cannot be made or the notice given."

3. The relevant portions of G.L. 1956 (1969 Reenactment) § 6A-3-407 read as follows:
"(2) As against any person other than a subsequent holder in due course
(a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless

*Abrahams*, 125 Ariz. 42, 607 P.2d 25 (1979); *Katski v. Boehm*, 249 Md. 568, 241 A.2d 129 (1968); *Bank of New Mexico v. Rice*, 78 N.M. 170, 429 P.2d 368 (1967); *Thomas v. Osborn*, 13 Wash.App. 371, 536 P.2d 8 (1975). Here, Heymann has never suggested that the change in the note was made for a fraudulent purpose. Consequently, the note will not be vitiated.

■ Heymann has argued that even if he is an endorser, the trial justice erred by awarding prejudgment interest from March 10, 1973, to the date of judgment because no claim against him arose prior to October 7, 1977, the date when demand for payment was made upon him. We agree.

Under the provisions of an endorser's contract, there is no obligation to pay the instrument until it has been dishonored by the maker and the endorser has received notice of dishonor. *See* G.L. 1956 (1969 Reenactment) § 6A–3–414. Because an endorser's contract does not become enforceable against him until there has been notice of dishonor, there can be no cause of action arising until there has been the requisite notice. This rule has been statutorily enacted in G.L. 1956 (1969 Reenactment) § 6A–3–122(3). Hence, prejudgment interest can be awarded Gaffin only from October 7, 1977, the day Heymann received notice of dishonor, to the date of judgment.

The defendant's appeal is sustained in part and denied in part, the judgment appealed from is vacated, and the case is remanded to the Superior Court for recomputation of the interest and the entry of an appropriate judgment.

SHEA, Justice, did not participate.

that party assents or is precluded from asserting the defense;
(b) no other alteration discharges any party and the instrument may be enforced according to its original tenor, or as to incomplete instruments according to the authority given."