## SHAPIRO ET AL. *v.* MARCUS

[No. 222, October Term, 1955.]

*Decided August 21, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, HENDERSON and HAMMOND, JJ.

*Hyman Ginsberg,* with whom were *Ginsberg & Ginsberg* on the brief, for the appellants.

*Ellis Levin* and *Calman A. Levin,* with whom was *Charles J. Levey* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal from an order of the Orphans' Court of Baltimore City, passed upon the petition of Rena Marcus for the probate of the will of Edward Marcus, which determined that the decedent was at the time of his death a resident of and domiciled in Baltimore City. The petition was contested by the appellants, who claimed that the decedent at the time of his death was a resident of Anne Arundel County. Testimony was taken and arguments of counsel for both sides were heard and the case was thereafter determined, Chief Judge Foster and Associate Judge Friedman joining in the order and Associate Judge Marshall dissenting therefrom.

The appellants are persons named in the will of Edward Marcus as Guardians and Trustees for his minor son, Byron Earl Marcus. The will was dated April 6, 1954, and it did not name any executor. The appellants made some claim that their designation as Guardians and Trustees for the minor son of the testator should be construed also as an appointment of them as Executors, but this contention is not pressed.

On May 10, 1955, Edward Marcus, who was then a widower, married the appellee, Rena Marcus, who was a widow and who had one child, a daughter.

The appellants assert that the only question in controversy is whether or not the late Edward Marcus was domiciled in Anne Arundel County or in Baltimore City at the time of his death. The appellee states this as the first question, but raises as a second question whether or not the appellants have any standing to prosecute this appeal.

There is no controversy over the legal rules which determine the question of domicile. Without elaborating the definition of "domicile," we may repeat what was said in *Shenton v. Abbott,* 178 Md. 526, at 530, 15 A. 2d 906, at 908: "It is well defined as that place where a man has his true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he has, whenever he is absent, the intention of returning."

It is also stated in *Shenton v. Abbott,* a little below the above quotation that: "It is a fundamental rule that, in order

to effect a change of domicile, there must be an actual removal to another habitation, coupled with an intention of remaining there permanently or at least for an unlimited time."

Under Section 371 of Article 93 of the Code (1951) the will of a testator is to be probated where letters testamentary or of administration may be granted, and that place is the county where the decedent had his "mansion house or residence." Code (1951), Article 93, Section 17.

The jurisdiction of the Orphans' Court includes the power to determine the question of the domicile of the decedent. Code (1951), Article 93, Sections 17, 254, 371; *Raborg v. Hammond*, 2 Harris & G. 42; *Stanley v. Safe Deposit & Trust Co.*, 87 Md. 450, at 454, 40 A. 53.

There was evidence before the Orphans' Court on both sides of the question of domicile. We do not think that any useful purpose can be served by reviewing this evidence in detail.

In general, the evidence on behalf of the appellants showed that prior to his second marriage the decedent had been domiciled in Annapolis, that he conducted his business there and occupied an apartment over his store, that he had a summer home at Bay Ridge in Anne Arundel County, and that after his marriage to the appellee he continued to conduct his business at Annapolis and retain his apartment there, and that a new home in the City of Baltimore which was being built for the decedent and the appellee had not been completed and hence they had not moved into it prior to the time of the death of Edward Marcus. The appellants also produced testimony to show that the decedent was very fond of Annapolis, and his son testified that on the day before his death the decedent said that he was sorry that he would have to move to Baltimore later. It was shown that he was still on the list of voters in Annapolis at the time of his death, that he maintained membership in a number of lodges or orders in that city, and that on the day of his death he was being installed as an officer at one of these lodges and died while there. There seems to be no dispute on the part of the appellants that it was the intention of the decedent to make his home in Baltimore after the new house was constructed,

but they deny that he had actually changed his domicile to Baltimore City up to the time of his death.

The evidence on behalf of the appellee was, in brief, that following her marriage to Edward Marcus in May, 1955, they had spent the summer at Mr. Marcus' summer place at Bay Ridge, but that at the end of the summer he had actually moved to Baltimore and made his home at his wife's apartment, which was over a store in Baltimore City where she conducted a women's wearing apparel business. The apartment was small and was crowded when Mr. and Mrs. Marcus, her daughter by her former marriage and his son by his former marriage were all living there. In fact, the son had to sleep on a divan or sofa in the living room. There was also evidence, however, to show that Mr. Marcus commuted from Baltimore to Annapolis to conduct his business, and that a considerable amount of furniture had been removed from the apartment in Annapolis. Mrs. Marcus testified that her late husband had not occupied that apartment after their marriage. There was also evidence to show that for about two months prior to his death Mr. Marcus had been endeavoring to sublease the Annapolis apartment and that about two weeks before his death he had been in active negotiations for the sale of his business there. There was testimony by a physician, who had been Mrs. Marcus' physician for about a year and a half previously, that he had given Mr. Marcus a physical checkup shortly before the latter's marriage with the appellee, and that in November, 1955, Mr. Marcus had said to him, "You are going to be my family doctor now because I am living here, and I intend to live in Baltimore." In addition, there was testimony that Mr. Marcus in the late summer of 1955 had gotten in touch with a representative of the Board of School Commissioners of Baltimore City with regard to the payment of tuition for his son Byron at the Baltimore Polytechnic Institute, and had stated that he was then residing at 5323 Park Heights Avenue (which was the address of the appellee's apartment). As a result of this change of residence he was no longer required to pay tuition for his son as a non-resident of Baltimore City.

The fact that Mr. Marcus was still on the roll of voters

at Annapolis is not particularly significant since his removal to Baltimore had occurred less than six months prior to his death. Therefore, even if there had been an intervening election (and there had not been), Mr. Marcus could not have established a voting residence in Baltimore up to the time of his death. The appellants blandly seek to brush off Mr. Marcus' talk with a School Board official as simply a move to avoid paying tuition.

We shall not undertake to compare the facts of this case with those of *Shenton v. Abbott, supra,* or of *Wagner v. Scurlock,* 166 Md. 284, 170 A. 539, or *Brafman v. Brafman,* 144 Md. 413, 125 A. 161, all cited by the appellants, nor with those of *Pattison v. Firor,* 146 Md. 243, 126 A. 109, and other cases cited by the appellee, because it seems unnecessary to do so.

We think, that the evidence was sufficient to sustain the conclusion arrived at by a majority of the Orphans' Court on the disputed question of fact with regard to the decedent's domicile. *Pattison v. Firor, supra.* It has been held in a number of cases that there is a presumption when an appeal is taken from an Orphans' Court of the correctness of that court's decision on a disputed question of fact where such a question has been litigated by adversary proceedings. *Lowe v. Lowe,* 6 Md. 347; *Wingert v. Albert,* 127 Md. 80, 95 A. 1055; *Wingert v. State,* 129 Md. 28, 98 A. 224; *Wilson, In re Estate of Martin,* 135 Md. 195, 108 A. 797.

In the *Lowe Case* the Orphans' Court ordered the sale of personal property for the payment of debts, claims and commissions. The appellant contended that there had been no sufficient showing of the necessity for such a sale. This Court, after holding that the order had not been passed *ex parte* said: "Moreover the order comes before us upon appeal, and being the decision of a court having jurisdiction in the premises, it is to be considered as correct, until the party appealing shows it to be otherwise." (6 Md. 357).

In *Wingert v. Albert, supra,* the Orphans' Court passed an order for the removal of two appraisers, previously appointed, on the ground that they did not possess suitable qualifications. This Court said: "These were largely questions of fact to be

found by the Court upon the evidence before it, and there can be no doubt that if these facts be true the Orphans' Court had the power to remove the appraisers. * * * There is a presumption in favor of the correctness of the finding of the Court upon these questions of facts, and upon questions like those presented by this appeal, we think no good purpose can possibly be subserved by a discussion and recapitulation of the evidence." (127 Md. 85).

*Wingert v. State, supra,* quotes a part of the passage from *Wingert v. Albert* which we have just quoted.

In *Wilson, In re Estate of Martin, supra,* the facts pertaining to an order appealed from were not disclosed by the record, and this Court therefore could not determine whether or not the Orphans' Court had correctly decided the questions presented to it, but after pointing this out the opinion went on to say: "but as the facts were before that Court and were considered by it in reaching its decision, there is a presumption in favor of the correctness of the Court's finding thereon." The Court cited the two *Wingert Cases, supra,* in support of this statement.

In the light of the above authorities and on the basis of the evidence submitted by the appellants as outlined above, we do not think that they have met the burden stated in *Lowe v. Lowe, supra,* of showing that the decision of the Orphans' Court was erroneous. Although neither Rule 9 (c) of Part Three, III, of the General Rules of Practice and Procedure, nor the like rule with regard to the review of facts prevailing in equity cases, is applicable to appeals from the Orphans' Court, we think that the authorities to which we have referred establish substantially the same rule as applicable to the review of facts on such appeals and, consequently, that on such questions the judgment of the Orphans' Court should not be reversed unless clearly erroneous. This conclusion is supported by the fact that the same consideration which is so often referred to as the foundation of the rule in appeals from courts of law or equity, that the trial court had the opportunity to hear and observe the witnesses, is also present here. Applying that rule to this case, the judgment of the Orphans' Court will be affirmed.

In reaching our conclusion on the first question, we have assumed, but do not decide, that the appellants, standing in *loco parentis* to a beneficiary, have such a legal interest in the place of probate of the will of the decedent as to entitle them to appeal.

*Order affirmed, with costs to the appellee.*