HALL, ADMINISTRATRIX *v.* MORRIS

[No. 141, October Term, 1956.]

*Decided May 30, 1957.*

*Motion for rehearing, filed June 24, 1957, denied June 25, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Harry Leeward Katz,* with whom was *John Carroll Weiss, Jr.,* on the brief, for the appellant.

Submitted on brief by *James C. Mitchell* for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The principal controversy in this case is whether one Martin F. Harp was domiciled in Maryland or in Florida at the time of his death on May 23, 1954. The appellant, Mrs.

Edith Johnson Hall, a sister of the late Mrs. Harp, who had predeceased her husband, offered the will of Mr. Harp for probate in the Orphans' Court for Charles County. It was there admitted to probate, and Mrs. Hall was appointed administratrix *c.t.a.* of Mr. Harp's estate. Mrs. Alice Harp Morris, the appellee, a sister of Mr. Harp, then filed a petition seeking the revocation of the letters and the transmittal of the will to Florida for probate. This petition asserted that the decedent had been domiciled in Florida. The administratrix *c.t.a.* filed an answer asserting that he was domiciled in Maryland. After a hearing the Orphans' Court rendered a decision that the decedent had been domiciled in Maryland. Mrs. Morris took an appeal to the Circuit Court for Charles County under Code (1951), Article 5, Section 69. In accordance with that Section the case was tried *de novo* in the Circuit Court. It was heard by Judge Digges, sitting without a jury. The testimony of ten witnesses was taken in open court, and the testimony of six others, taken by deposition, was offered in evidence. Judge Digges filed a comprehensive opinion and an order in conformity therewith. In the order he recited findings of fact (a) that Harp was never a legal resident of Maryland and (b) that at the time of his death he was domiciled in Florida. The first paragraph of his order accordingly reversed the decision of the Orphans' Court on the matter of domicile. The second paragraph of the order provided that "the construction and interpretation" of Mr. Harp's will and "the distribution of personal estate thereunder must be according to the law of the State of Florida since no contrary intention appears from the Will of Martin H. Harp", and the third paragraph directed that the costs of the appeal be paid out of the estate in the hands of the administratrix *c.t.a.* The appeal is from that order.

The primary question before us is, as stated, with regard to the domicile of Mr. Harp. There is a further question before us with regard to the second paragraph of the order.

Mr. Harp's will was executed in 1928. At that time he was domiciled in Illinois. Illinois, we are informed, has a statute which saves legacies from lapsing; so does Maryland. (Code (1951), Article 93, Section 351, which also applies to de-

vises.) Florida, we are told, does not have an anti-lapse statute. Behind the question of domicile lie controversies between the heirs or next of kin of the husband and the heirs or next of kin of the wife, as to whether or not the testator's gifts are saved by an anti-lapse statute and as to the proper construction of his will. Mr. Harp's will is brief. By the first item he directed the payment of his debts and funeral expenses; by the third, he appointed his wife as his executrix. The second item consists of two sentences. By the first of these he gave, devised and bequeathed *all* of his property, real, personal or mixed, to his wife; by the second, he undertook to give, devise and bequeath *all the* rest, *residue* and remainder of his property, real, personal or mixed, in fee simple, to his "wife, Minnie Harp, her heirs or assigns forever."

To dispose of the secondary question first, we do not think that any question as to the construction or interpretation of the will was before the Orphans' Court or before the Circuit Court on appeal therefrom in the present case; and certainly we do not undertake to decide any such question on this appeal. The sole question controverted was one of domicile, and there was no attempt to seek a construction or interpretation of the will at this stage of the proceedings. The second paragraph of the order of the Circuit Court is a correct statement of the law under *Lowndes v. Cooch*, 87 Md. 478, 39 A. 1045, in saying that the distribution of personal property is to be made in accordance with the law of the decedent's domicile. We do not understand that paragraph to undertake to decide what the law of Florida may be, what effect, if any, might be accorded in this case to the Illinois law under the Florida law or what the law of Illinois (if applicable) may be. We do not understand this paragraph of the order of the Circuit Court to undertake to do more than state the rule of *Lowndes v. Cooch, supra;* nor do we take it as precluding the remission of the net estate to an administrator *c.t.a.* appointed by the Florida court having probate jurisdiction over Mr. Harp's estate, for distribution under the orders of that court. (So far, we understand, Florida has appointed only an ancillary administrator, *c.t.a.*)

On the question of domicile, there seems to be no contro-

versy over the fact that Mr. Harp was domiciled in Illinois in 1928 or over the fact that he acquired a new domicile in Washington, D. C., probably about 1933 or 1934, and retained it until 1950. In the late 1940's, Mr. and Mrs. Harp were engaged in business as concessionaires at amusement parks, or the like, or on excursion vessels operating in the Washington or Chesapeake Bay area. Mr. Harp was also in partnership with a Mr. Cyril W. Martin in certain concessions at Gwynn Oak Park in Baltimore, which were actually operated by Mr. Martin or under his direction. Mr. Harp for some years "worked the boats" and Mrs. Harp operated a concession at Marshall Hall Park, Accokeek, Charles County, Maryland. The Harps started working at Marshall Hall Park in 1934. After Mr. Harp ceased to work on ships, both Mr. and Mrs. Harp worked at Marshall Hall Park. While he was "working the boats," he often came to the Park, but not during the day.

All of the Harps' concession activities were carried on during the spring and summer, when amusement parks and excursion boats were in operation. They had their home in Washington for some years in an apartment which they rented from Mrs. Harp's niece and the latter's husband, the Winklers. It was their custom to visit Florida each winter— a custom which began when they were living in Kewanee, Illinois.

In 1950 the Winklers sold their apartment house where the Harps lived. After a brief stay with the Winklers at another address in Washington (1218 Buchanan Street, N. E.), the Harps moved to Marshall Hall Park and lived in a room behind the concession which they operated. They took there some of the furniture which they had had in Washington.

In the fall of 1950 they went to Florida, and in November of that year they bought a home in St. Petersburg, Florida. For the next three years they spent about six months in Florida and then came up to Marshall Hall Park about two weeks before it opened for business in the spring and returned to Florida two or three weeks after it closed at the end of the summer season. Apparently in 1953 they wanted better quarters at Marshall Hall Park and paid for putting up a new

building at a cost of about $5,000, which seems to have been intended for use both for their popcorn concession and for their living quarters.

Mrs. Harp died at St. Petersburg, Florida, on January 3, 1954, and was buried there. Mr. Harp returned to Marshall Hall Park, Maryland, in the spring of 1954, and died there on May 23 of that year. His body, too, was buried at St. Petersburg. In this case, as in *Shapiro v. Marcus*, 211 Md. 83, 124 A. 2d 846, there is no controversy over the legal rules which determine the question of domicile, and the questions here, as there, are factual.

The appellant raises one contention with regard to the facts which she seeks to rest upon the *Shapiro* case. This relates to the weight to be given to the findings of the Orphans' Court, which had found in her favor on the issue of domicile. This contention (even if properly raised) is not tenable. The *Shapiro* case came to this Court on a direct appeal from an Orphans' Court. We there followed several prior decisions of this Court and held that the judgment of the Orphans' Court on a disputed question of fact, litigated by adversary proceedings, should not be reversed unless clearly erroneous. Here, however, the case does not come to us on direct appeal from an Orphans' Court, but reaches us on appeal from a Circuit Court, where, in accordance with Section 69 of Article 5 of the Code, the case was tried *de novo*. The record does not even include the evidence submitted to the Orphans' Court. In the Circuit Court the case was tried by the Judge, sitting without a jury, and Rule 886 a of the Maryland Rules (Rule 9 (c) of our former General Rules of Practice and Procedure, Part Three, III) is applicable. Under it the judgment of the Circuit Court is not to be set aside on the evidence unless clearly erroneous, and due regard is to be given to the opportunity of the trial court to judge the credibility of the witnesses.

The appellant contends that Mr. Harp acquired a domicile in Maryland in 1950, that he did not acquire a domicile in Florida and that, even if he had, he acquired a domicile in Maryland in 1954, following his wife's death. The trial Court found against the appellant on all of these contentions.

The appellant argues that the Harps acquired a domicile at Marshall Hall Park in 1950 after leaving Washington and before going to Florida in the fall. We fully agree with the learned trial judge in rejecting this contention. They worked as and where they had worked before; they stayed there during the season. We find no manifestation of any intent to make it their home. It was a temporary abiding place which they occupied for their business convenience. As was said in *Shenton v. Abbott*, 178 Md. 526, at 530, 15 A. 2d 906, at 908: "It is a fundamental rule that, in order to effect a change of domicile, there must be an actual removal to another habitation, coupled with an intention of remaining there permanently or at least for an unlimited time."

The trial judge found that a change of domicile did occur when the Harps went to Florida, bought a home and established themselves there. The evidence was ample to sustain this finding. After the Washington home was gone they had the problem of finding a new home. This they did at St. Petersburg. They sought and obtained a homestead exemption as residents of Florida and renewed it each year. It appears that an affidavit was not required until after a law enacted in 1953 became effective. However, the Harps also became registered voters in Florida and the decedent made an affidavit of residence in Florida in support of his application to be registered as a voter. They transferred their church membership from a church in Washington to one in St. Petersburg and they made statements to the effect that Florida was their home. Perhaps, as the appellant contends, Mrs. Harp was more enthusiastic about Florida than was Mr. Harp, but that does not alter any of the facts just stated or reduce their legal significance. It may also be noted that they signed the contract to purchase their Florida home at what would seem to have been about the earliest practicable date (October 2, 1950). This must have been very soon after the close of the Marshall Hall Park season and their arrival in Florida, and it was on their first trip to Florida following the sale of the Washington apartment house where they had previously had their home.

The appellant's next contention is that even if Mr. Harp

acquired a domicile in Florida in 1950, he abandoned it and acquired a domicile in Maryland after his wife's death. To support this contention she relies largely upon: (1) a statement made by him just after Mrs. Harp's funeral to the effect that he could not stay there alone; (2) that he gave away some bedspreads and personal effects of Mrs. Harp's in the Florida house; (3) that he loaded his car with household goods and clothing when he drove north from Florida to Marshall Hall Park in March, 1954; (4) that he kept valuable papers, such as stock certificates and his will with him at the amusement park; (5) that his Federal income tax return and a social security record issued in 1953 showed Accokeek [Marshall Hall Park], Maryland, as his home address; (6) that he instructed three corporations in which he held stock to change his address to Accokeek, Maryland; (7) that he bought a license for his car in addition to his Florida license; (8) his retention of membership in one or more Washington organizations; and (9) business plans for the next winter.

We think that the evidence fails to establish a change of domicile by Mr. Harp from Florida to Maryland. One retains a domicile once established until he acquires a new one. *Shenton v. Abbott, supra; Restatement, Conflicts,* § 23; *Beale, Conflict of Laws,* § 23.1.

Mr. Harp's statement (Item (1) in the above list) that he could not remain at his Florida home alone was offset by later statements indicating that he expected to return in the fall. Though there was evidence that he considered the possibility of selling the St. Petersburg property, it seems that he never actually decided to do so. He left a key to the house with a neighbor in St. Petersburg so that the house could be shown if he should decide to sell it. No such decision is shown.

His giving away of some bedspreads and personal effects of Mrs. Harp (Item (2) above) does not impress us as showing an intention to abandon his Florida domicile. Nor does his taking household effects which would presumably be useful to him during his summer sojourn at Marshall Hall Park, or clothing which was probably as well suited for use there in summer as at St. Petersburg in winter (Item (3)). That

he had his valuable papers in a box at the amusement park (Item (4)) seems immaterial on the question of domicile. Doubtless they would have been safer in a safe deposit box in a bank vault in Florida, Washington or Maryland. It was, however, probably less risky to keep them in the premises which he was occupying than to leave them in a vacant house for several months.

The Federal income tax returns (Item (5)) also seem quite unconvincing as manifesting domicile. Unsigned copies of the whole or parts of such returns for the years 1945 to 1953, inclusive, are in the record. (Some are Mr. Harp's individually, some are joint returns.) For the years 1945-1949, inclusive, they show the home address at the apartment which the Harps rented from the Winklers. For the year 1950 the return shows the Harps' address as 1218 Buchanan Street, N. E., Washington, D. C. This is the Winklers' home address. It is one place at which no one claims that Mr. Harp was ever domiciled, yet it covers the very year in which the appellant asserts that the Harps established a Maryland domicile. The first year for which the Federal return shows a Maryland address is 1951. It was also shown on the returns for the years 1952 and 1953. The last return filed by Mr. Harp was that for the year 1953, and it was apparently filed in March, 1954. It is, of course, speculative to guess why Mr. Harp chose to use a Maryland address on his Federal income tax returns when he chose to do so, and why he gave it for social security records. Perhaps he wished to continue to file his returns at the same office as when he was domiciled in Washington; perhaps he wished to file them in the same district where he received his business income from concessions at two amusement parks. He may have thought it desirable to have his Federal income tax and social security records in agreement as to his address. We may add the observation that his income tax records would be far more persuasive as indicating a Maryland domicile if they had included a Maryland resident income tax return. They did not include any Maryland return.

Mr. Harp's change of address for dividend checks and other purposes (Item (6)) seems little more persuasive, and

certainly falls far short of being conclusive. This is the more evident when we note that on April 12, 1950, which is almost exactly the time at which the appellant claimed that Mr. Harp acquired a Maryland domicile, he changed his address on the records of Cities Service Company to 1218 Buchanan Street, N. E., Washington, D. C., the home of the Winklers, at which he was never domiciled. His changes of address on corporate records seem to have been simply matters of convenience.

Other matters relied on by the appellant (Items (7) to (9)) call for only brief comment. Mr. Harp's retention of membership in some Washington organization or organizations is perfectly natural, but far from conclusive. See *Shapiro v. Marcus, supra,* where much stronger local associations had been maintained and were not found sufficient to prevent a change of domicile. Likewise, Mr. Harp's purchase in 1954 of a license for his car in addition to his Florida license does nothing to substantiate a claim of a Maryland domicile. The additional license was obtained from the District of Columbia, not from the State of Maryland. Finally, the testimony of Mr. Harp's partner in the Gwynn Oak Park concessions as to plans for operations by both of them for the next winter indicates that Mr. Harp would have worked in Washington, not Maryland, if these plans had ever been carried beyond the discussion stage. Again the appellant is faced by the rule that one cannot lose an existing domicile until he acquires a new one. Mr. Harp did not.

Since we agree with the holding of the trial court that Mr. Harp did not acquire a domicile in Maryland in 1950 (or at any other time), there is no need to consider whether or not his will could have been probated here under our statute (Code (1951), Article 93, Section 365) which authorizes the probate of the will of a person "originally" domiciled in Maryland. Cf. *Johns Hopkins University v. Uhrig,* 145 Md. 114, 125 A. 606.

As we have noted, no question of construction of Mr. Harp's will was before the Circuit Court and none was determined by its order or is presented on this appeal. Finding that the evidence was ample to support the conclusion of the

trial Judge that the decedent was domiciled in Florida, we shall affirm the order appealed from insofar as it relates to domicile. However, since we find no domiciliary basis upon which to support the probate of Mr. Harp's will in the Orphans' Court of Charles County, and since all of the questions as to the interpretation or construction of his will and as to the law which may be applicable thereto remain open for determination in whatever court may be the appropriate forum, we think that the second paragraph of the order of the Circuit Court for Charles County should be modified to the extent of remanding the case to the Orphans' Court of that County for further proceedings not inconsistent with this opinion. It would appear appropriate to proceed in accordance with the original prayers of the appellant's petition. In other respects the order appealed from will be affirmed.

> *Order modified, and as modified affirmed; the costs to be paid out of the Maryland estate of Martin F. Harp.*