JOHN S. TOLL, President, University of Maryland
*v.* JUAN CARLOS MORENO et al.

[Misc. No. 2, September Term, 1978.]

*Decided February 21, 1979.*

*David H. Feldman, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General,* and *Robert A. Zarnoch, Assistant Attorney General,* on the brief, for appellant.

*Alfred L. Scanlan,* with whom were *Shea & Gardner, James R. Bieke, John Townsend Rich* and *Raymond M. Bernstein* on the brief, for appellees.

ELDRIDGE, J., delivered the opinion of the Court.

The Supreme Court of the United States, pursuant to the Uniform Certification of Questions of Law Act, Maryland Code (1974), § 12-601 *et seq.* of the Courts and Judicial

Proceedings Article, requests that we answer the following question of law:

"Are persons residing in Maryland who hold or are named in a visa under 8 U. S. C. § 1101 (a) (15) (G) (iv) (1976 ed.), or who are financially dependent upon a person holding or named in such a visa, incapable as a matter of state law of becoming domiciliaries of Maryland?" *Elkins v. Moreno,* 435 U. S. 647, 669, 98 S. Ct. 1338, 1351, 55 L.Ed.2d 614 (1978).

The facts pertinent to this question are as follows. The named plaintifffs in this class action, Juan C. Moreno, Juan P. Otero and Clare B. Hogg, are all nonimmigrant aliens attending the University of Maryland,[1] and they have all resided in Maryland for substantial periods of time.[2] The three students are financially dependent upon nonimmigrant parents who are employees of either the Inter-American Development Bank or the International Bank for Reconstruction and Development. As such, the plaintiffs are in this country under "G-4 visas," which is a nonimmigrant visa issued to "officers, or employees ... of international organizations, and members of their immediate families" pursuant to 8 U. S. C. § 1101 (a) (15) (G) (iv). The parents of these plaintiffs, as employees of international organiza-tions, are by treaty exempted from federal and state taxes on their organization salaries. However, any other monies earned are fully subject to applicable federal and state income taxes.

The controversy is over these students' status for tuition purposes at the University of Maryland. Moreno, Otero and Hogg sought "in-state" tuition status at the school. The University has established a general policy statement which

---

1. "(15) The term 'immigrant' means every alien except an alien who is within one of the following classes of nonimmigrant aliens

"(G) ... (iv) officers, or employees of ... international organizations [recognized under the International Organizations Immunities Act, 59 Stat. 669, 22 U.S.C. § 288 *et seq.*], and the members of their immediate families." 8 U.S.C. § 1101 (a) (15).

2. Moreno has lived in Maryland for 15 years, Otero for 10 years and Hogg for 5 years.

sets forth standards for determining under what circumstances "in-state status for admission, tuition and charge-differential purposes" should be granted. It provides:

"*General Policy*

"1. It is the policy of the University of Maryland to grant in-state status for admission, tuition and charge-differential purposes to United States citizens, and to immigrant aliens lawfully admitted for permanent residence in accordance with the laws of the United States, in the following cases:

"a. Where a student is financially dependent upon a parent, parents, or spouse domiciled in Maryland for at least six consecutive months prior to the last day available for registration for the forthcoming semester.

\* \* \*

"2. It is the policy of the University of Maryland to attribute out-of-state status for admission, tuition, and charge differential purposes in all other cases.

\* \* \*

"*Definitions*

"1. A student is financially dependent if he receives half or more than half of his support from another person or persons, or appears as a dependent on the federal or state income tax return of any other person. . . .

\* \* \*

"4. A domicile is a person's permanent place of abode; namely, there must be demonstrated an intention to live permanently or indefinitely in Maryland. For purposes of this policy only one domicile may be maintained at a given time. . . ."

As part of the University's policy statement, several criteria are set forth for determining domicile:

"a. Own or rent and occupy real property in Maryland as one's domicile on a year-round basis.

"b. Maintain a substantially uninterrupted presence within Maryland for six consecutive months, including those months when the University is not in regular session.

"c. Maintain within the State of Maryland all or substantially all personal possessions.

"d. Pay Maryland income tax on all earned income including all taxable income earned outside the State.

"e. Register all owned motor vehicles in Maryland.

"f. Possess a valid Maryland driver's license, if licensed.

"g. Register to vote in Maryland, if registered.

"h. Give a Maryland home address on federal and state income tax forms."

Moreno's application for in-state status was denied based on the school's determination that neither he nor his father were Maryland domiciliaries. Otero was refused in-state status because he was not a United States citizen nor an alien admitted for permanent residence to this country. Upon denial of their applications, in accordance with University procedures, Moreno and Otero appealed to the Inter-campus Review Committee. The Review Committee also denied the requests, stating:

"The differential in tuition for in-state and out-of-state fees is based upon the principle that the State of Maryland should subsidize only those individuals who are subject to the full scope of Maryland tax liability. Such taxes support in part the University. The University of Maryland's present classification policies rest upon this principle of cost equalization. In examining the particulars of your case it is felt that neither you nor your parents are subject to the full range of Maryland taxes (e.g., income tax) and therefore the University must classify you as out-of-state with the consequential higher tuition rate.

"You have raised the question of domicile. *It is our opinion that a holder of a G-4 visa cannot acquire the requisite intent to reside permanently in Maryland, such intent being necessary to establish domicile.*" (Emphasis supplied.)

After the refusal by the Review Committee to grant Moreno and Otero in-state status, a final intra-school review was sought from the President of the University. He also refused their requests, stating:

"It is the policy of the University of Maryland to grant in-state status for admission, tuition and charge-differential purposes only to United States citizens and to immigrant aliens lawfully admitted for permanent residence. Furthermore, such individuals (or their parents) must display Maryland domicile. This classification policy reflects the desire to equalize, as far as possible, the cost of education between those who support the University of Maryland through payment of the full spectrum of Maryland taxes, and those who do not. In reviewing these cases, it does not appear that the parents pay Maryland income tax. It is my opinion, therefore, that the aforesaid purpose of the policy, as well as the clear language of the policy, requires the classification of Mr. Moreno and Mr. Otero as 'out-of-state.'

"The University's classification policy also distinguishes between domiciliaries and non-domiciliaries of Maryland. In this regard, *it is my opinion, and the position of the University, that the terms and conditions of a G-4 nonimmigrant visa preclude establishing the requisite intent necessary for Maryland domicile.* Thus, because Mr. Moreno and Mr. Otero are not domiciliaries of Maryland, and because of the underlying principle of cost equalization, I am denying the requests for reclassification." (Emphasis supplied.)

The third plaintiff, Clare B. Hogg, was also denied in-state status. Her application was initially rejected by the University because:

"[T]he policy for the determination of in-state status limits the ability to establish an in-state classification to United States citizens and immigrant aliens admitted to the United States for permanent residence. As the person upon whom you are dependent holds a G-4 visa, and as you hold a G-4 visa, in my judgment you are not eligible for an in-state classification.

"Also, the person upon whom you are dependent does not pay Maryland income tax on all earned income, including income earned outside the state. I feel this further weakens your request for reclassification, as this is an important criterion in determination of domicile."

She took an appeal to the Review Committee, which said:

". . . [A] holder of a non-immigrant visa, including the G-4 visa you hold, cannot acquire the requisite intent to reside permanently in Maryland, such intent being necessary to establish domicile."

A final administrative appeal was taken to the University President, and he rejected the application for reasons similar to those given plaintiffs Moreno and Otero.

Receiving no relief from within the University, the plaintiffs filed a class action against the school and its President in the United States District Court for the District of Maryland.[3] Plaintiffs sought injunctive and declaratory

---

3. The District Court certified the following class:

"All persons now residing in Maryland who are current students at the University of Maryland, or who chose not to apply to the University of Maryland because of the challenged policies but would now be interested in attending if given an opportunity to establish in-state status, or who are currently students in senior high schools in Maryland, and who

(a) hold or are named within a visa under 8 U.S.C. § 1101 (a) (15) (G) (iv) or are financially dependent upon a person holding or named within such a visa." Moreno v. University of Maryland, 420 F. Supp. 541, 564 (1976).

relief for themselves and other similarly situated students covered by a G-4 visa, alleging that the defendant's refusal to give them in-state status violated various federal statutes, as well as the Due Process, Equal Protection, and Supremacy Clauses of the United States Constitution.[4]

In the District Court the plaintiffs maintained, *inter alia,* that the University's policy created an irrebuttable presumption of non-domicile in violation of the Due Process Clause of the Fourteenth Amendment. The University adopted, the plaintiffs argued, an irrebuttable presumption that G-4 visa holders are incapable of establishing Maryland domicile, a fact that is not always true. On the other hand, the defendant asserted that in-state status is determined by the Maryland common law of domicile, and that the very terms and conditions of a G-4 visa prohibit these nonimmigrant aliens from establishing Maryland domicile.

The United States District Court, in an opinion by Judge James R. Miller, Jr., determined that there was nothing in Maryland law to prevent the plaintiffs from being domiciled in this State. It also found that the terms and conditions of a G-4 visa under federal law did not render the plaintiffs legally incapable of being domiciled here. Relying on *Vlandis v. Kline,* 412 U. S. 441, 93 S. Ct. 2230, 37 L.Ed.2d 63 (1973), the District Court held that the University's "In-State Policy" amounts to a constitutionally impermissible irrebuttable presumption which is not universally true. *Moreno v. University of Maryland,* 420 F. Supp. 541, 559-560 (D. Md. 1976).[5] The court then ordered the defendant President to allow the named plaintiffs, and others of the class, the opportunity to demonstrate that they are entitled to in-state status. The defendant took an appeal to the United States Court of Appeals for the Fourth Circuit, which affirmed the

---

4. Under the authority of Monroe v. Pape, 365 U. S. 167, 81 S. Ct. 473, 5 L.Ed.2d 492 (1961), the University was dismissed from the suit. However, the President of the University, in his official capacity, remained as a defendant. *See* 420 F. Supp. at 548-550.

5. In view of the District Court's holding on the due process issue, that court deemed it unnecessary to consider the plaintiffs' alternative contentions, 420 F. Supp. at 560.

District Court's decision, *Moreno v. Univ. of Maryland,* 556 F. 2d 573 (4th Cir. 1977).

The defendant's petition for a writ of certiorari was granted by the Supreme Court of the United States. There, the University President maintained that the lower federal courts were in error in concluding that under Maryland law and federal law a G-4 visa holder can become a domiciliary of this State. In addition, the President of the University defended the constitutionality of the University's position, asking the Supreme Court to "overrule or further limit *Vlandis* [*v. Kline, supra*]." 435 U. S. at 660.

Applying the principle that decisions on constitutional issues should be avoided unless necessary, the Supreme Court expressed the view that no such showing of necessity had been made out, and that an answer to the question whether G-4 aliens were capable of becoming domiciliaries under federal law and Maryland common law might be dispositive of the case. The Court explained (435 U. S. at 661-662):

> "If G-4 aliens cannot become domiciliaries, then respondents have no due process claim under either *Vlandis* or *Salfi* for any 'irrebuttable presumption' would be universally true. On the other hand, the University apparently has no interest in continuing to deny in-state status to G-4 aliens as a class if they can become Maryland domiciliaries since it has indicated both here and in the District Court that it would redraft its policy 'to accommodate' G-4 aliens were the Maryland courts to hold that G-4 aliens can have the requisite intent.
>
> "Accordingly, the question whether G-4 aliens have the capacity to acquire Maryland domicile is potentially dispositive of this case. Since the resolution of this question turns on federal statutory law and Maryland common law as to each of which there are no controlling precedents, we first set out the correct meaning of federal law in this area and then *sua sponte* certify this case to the Court of

Appeals of Maryland in order to clarify state-law aspects of the domicile question."

The Supreme Court went on to consider whether federal law prevented a person holding a G-4 visa from establishing a domicile in this State. The Court, while recognizing that generally nonimmigrant aliens may be viewed as "temporary visitors" to the United States, held that there was no legislative intent to preclude G-4 aliens from having a United States domicile. The Court stated that "it is clear that Congress did not require G-4 aliens to maintain a permanent residence abroad or to pledge to leave the United States at a date certain." *Id.* at 664. It concluded that any of the plaintiffs in this case could attain the status of a "permanent resident without difficulty." *Id.* at 668.

After dealing with the plaintiffs' status under federal law, the Supreme Court then certified to us the issue of whether such persons are "incapable as a matter of state law of becoming domiciliaries of Maryland." *Id.* at 669.

I.

In this Court, the first argument made by the defendant University President is that, irrespective of the general Maryland law of domicile, the University is authorized under state law [6] to establish such rules for tuition fees as it sees fit, and in this connection, to define "residence" as it shall determine. The University President argues that even if G-4 aliens possess the legal capacity to become Maryland domiciliaries, the school has the independent legal authority to apply a more restrictive standard which would exclude persons under G-4 visas from consideration for in-state status.[7]

---

**6.** Code (1957, 1975 Repl. Vol.), Art. 77A, § 15 (e), now Code (1978), § 13-104 (b) of the Education Article.

**7.** Consistent with this view, the Board of Regents of the University passed a resolution on June 23, 1978, declaring that:

"The Board of Regents deems its statutory authority under the laws of Maryland to include the power, right, or privilege to adopt a more restrictive definition of domicile for purposes of according in-state status for admissions, tuition, and charge-differentials than may be applicable generally or otherwise under the Maryland common law."

In response, the plaintiffs assert that the question of the school's authority to adopt its own standards for in-state status is not before this Court, and that the question certified for our consideration is limited to whether Maryland common law renders G-4 visa holders incapable of becoming domiciliaries of this State.

We agree with the plaintiffs in this regard. The specific question certified, in light of the Supreme Court's opinion in this case, is whether a person covered by a G-4 visa can become, *as a matter of Maryland common law,* a domiciliary of this State. The question concerns the general Maryland law of domicile and not the specific authority of the University under the Education Article of the Code. This is clear from the Supreme Court's opinion.

In setting forth its view of the dispute in this case, the Supreme Court stated (435 U. S. at 658-660, emphasis supplied):

"The University has consistently maintained throughout this litigation that, notwithstanding other possible interpretations of its policy statement, its 'paramount' and controlling concern is with domicile as defined by the courts of Maryland. It has eschewed any interest in creating a classwide exclusion based solely on nonimmigrant status or, apparently, on the fact that many G-4 aliens receive earned income that is exempt from Maryland taxation. Because *petitioner makes domicile the 'paramount' policy consideration* and because respondents' contention is that they can be domiciled in Maryland but are conclusively presumed to be unable to do so, this case is squarely within *Vlandis* as limited by *Salfi* to those situations in which a State 'purport[s] to be concerned with [domicile, but] at the same time den[ies] to one seeking to meet its test of [domicile] the opportunity to show factors clearly bearing on that issue.' *Weinberger v. Salfi,* 422 U. S. at 771."

This understanding of the defendant University President's position was based in part on the defendant's statement that " 'the "In-State Policy" is structured upon and reflects [the University's] understanding of the Maryland *common law of domicile.'* " (Emphasis supplied.) *Id.* at 660 n. 8. The Supreme Court's majority opinion specifically disputed the dissent's view of the issues in the case (which view the defendant is apparently now attempting to adopt for the first time in this Court), saying (*id.* at 659 n. 8, emphasis in original):

> "Petitioner will be surprised to learn from the dissent ... that the University's treatment of respondents is not really determined by the Maryland common law of domicile and therefore that this case is governed by *Weinberger v. Salfi,* 422 U. S. 749 (1975), not *Vlandis v. Kline,* 412 U. S. 441 (1973). For petitioner's view of the University's policy, contrary to that suggested by the dissent, has consistently been: 'The Defendant University distinguishes between *domiciliaries* and *non-domiciliaries* of the State of Maryland .... This represents a policy decision of the Board of Regents of the University, which has been implemented in the rulés and guidelines of the Policy Statement ....' Record 215 (emphasis added). And again: 'The wording of the "In-State" policy is structured so as to initially deny "in-state" status to non-immigrant aliens. This structure incorporates the determination that under the law and definition of *domicile as established and applied by Maryland courts,* non-immigrant aliens cannot display the intent to permanently reside within the State which is requisite to establishing Maryland domicile.' "

A further indication that the Supreme Court was concerned with the Maryland common law of domicile is evidenced by its comment that

> "the University apparently has no interest in continuing tó deny in-state status to G-4 aliens as a class if they can become Maryland domiciliaries since

it has indicated both here and in the District Court that it would redraft its policy 'to accommodate' G-4 aliens were the Maryland courts to hold that G-4 aliens can have the requisite intent." *Id.* at 661.

And counsel for the University President stated in oral argument to the Supreme Court

"that if the Court of Appeals of Maryland determined that a person with a G-4 visa is capable of forming the requisite intent to establish domicile, 'the odds are reasonably high that the case would become moot because the university would change its policy, but that judgment is one that would be made by the regents . . . .' " *Id.* at 661-662 n. 13.

Based upon this examination of the Supreme Court's opinion, it is evident that the defendant changed his position. In short, prior to the present proceedings in this Court, the University President maintained that the Maryland common law of domicile prevented G-4 aliens from having in-state status. Here, in a marked departure from his earlier position, the defendant insists that regardless of the general Maryland law of domicile, the University has the authority to adopt more restrictive standards for in-state status at the University. We concur with the plaintiffs that the certified question concerns the Maryland common law of domicile, and that the defendant's arguments relating to the University's power to adopt different criteria for in-state status are beyond the scope of the question. "[T]he Uniform Certification of Questions of Law Act, Code (1974), §§ 12-601 *et seq.,* of the Courts and Judicial Proceedings Article, does not authorize us to go beyond the questions certified in the order of the certifying court." *Krashes v. White,* 275 Md. 549, 557, 341 A. 2d 798 (1975). Consequently, we shall confine our discussion to the Maryland common law of domicile and its effect upon persons covered by G-4 visas.

## II.

The defendant's remaining contentions in this Court do purport to relate to the general Maryland law of domicile.

First, he contends that, under Maryland common law, domicile is not a unitary concept and that the meaning of domicile varies depending upon the particular context in which the concept is used. The defendant insists that in the present context, the University's policies, of limiting its expenditures and equalizing the costs of public education between those who have and those who have not contributed through income tax payments, compel the conclusion that G-4 visa holders are incapable of establishing a Maryland domicile.

Alternatively, the defendant argues that "[e]ven under domiciliary rules applied in other contexts," the plaintiffs cannot be domiciled in Maryland. In support of this argument, the defendant appears to rely on his assertion that "[m]ost nonimmigrants are neither expected nor permitted to stay here indefinitely," that G-4 visa holders' "lucrative salaries are not subject to State income tax," and that such persons cannot vote in Maryland.

(a)

An examination of the cases in this Court dealing with domicile demonstrates that the defendant's first contention regarding the law of domicile is untenable. The meaning of domicile and the basic principles for determining domicile have been the same in this State regardless of the context in which the issue of domicile arose.

The meaning of domicile and the principles for deciding domicile were recently summarized by Judge Smith for the Court in *Dorf v. Skolnik,* 280 Md. 101, 116-117, 371 A. 2d 1094 (1977):

"A person may have several places of abode or dwelling, but he can have only one domicile at a time. Domicile has been defined as the place with which an individual has a settled connection for legal purposes and the place where a person has his true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he has, whenever he is absent, the intention of returning.

The controlling factor in determining a person's domicile is his intent. One's domicile, generally, is that place where he intends it to be. The determination of his intent, however, is not dependent upon what he says at a particular time, since his intent may be more satisfactorily shown by what is done than by what is said. Once a domicile is determined or established a person retains his domicile at such place unless the evidence affirmatively shows an abandonment of that domicile. In deciding whether a person has abandoned a previously established domicile and acquired a new one, courts will examine and weigh the factors relating to each place. This Court has never deemed any single circumstance conclusive. However, it has viewed certain factors as more important than others, the two most important being where a person actually lives and where he votes. Where a person lives and votes at the same place such place probably will be determined to constitute his domicile. Where these factors are not so clear, however, or where there are special circumstances explaining a particular place of abode or place of voting, the Court will look to and weigh a number of other factors in deciding a person's domicile."

The Court went on in *Dorf,* quoting from *Bainum v. Kalen,* 272 Md. 490, 499, 325 A. 2d 392 (1974), to list many of the other factors to be considered in determining a person's domicile:

" 'These include such things as: the paying of taxes and statements on tax returns; the ownership of property; where the person's children attend school; the address at which one receives mail; statements as to residency contained in contracts or other documents; statements on licenses or governmental documents; where furniture and other personal belongings are kept; which jurisdiction's banks are utilized; membership in professional, fraternal, religious or social organizations; where one's

regular physicians and dentists are located; where one maintains charge accounts; and any other facts revealing contact with one or the other jurisdiction.' "

This Court's decisions involving domicile disclose that the above-quoted principles have been applied in all contexts. The issue of domicile has arisen in a variety of situations. *Dorf v. Skolnik, supra,* and *Bainum v. Kalen, supra,* were concerned with domicile as a qualification for office, as were *Gallagher v. Bd. of Elections,* 219 Md. 192, 148 A. 2d 390 (1959), and *Rasin v. Leaverton,* 181 Md. 91, 28 A. 2d 612 (1942). The same legal principles were applied in the cases involving domicile as a qualification for voting, *Howard v. Skinner,* 87 Md. 556, 40 A. 379 (1898); *Thomas v. Warner,* 83 Md. 14, 20-21, 34 A. 830 (1896); *Langhammer v. Munter,* 80 Md. 518, 31 A. 300 (1895); *Shaeffer v. Gilbert,* 73 Md. 66, 20 A. 434 (1890). Many other cases involve the totally dissimilar context of domicile for the purpose of administering decedents' estates, *Hall, Admx. v. Morris,* 213 Md. 396, 132 A. 2d 113 (1957); *Shapiro v. Marcus,* 211 Md. 83, 124 A. 2d 846 (1956); *Shenton v. Abbott,* 178 Md. 526, 15 A. 2d 906 (1940); *Pattison v. Firor,* 146 Md. 243, 126 A. 109 (1924); *Brafman v. Brafman,* 144 Md. 413, 125 A. 161, *cert. denied,* 265 U. S. 588, 44 S. Ct. 633, 68 L. Ed. 1193 (1924); *Whiting v. Shipley,* 127 Md. 113, 117, 96 A. 285 (1915). Nevertheless, these cases also set forth the identical principles governing domicile as were summarized in *Dorf v. Skolnik, supra.*

The same is true of the following cases. In *Harrison v. Harrison,* 117 Md. 607, 613-616, 84 A. 57 (1912), the determination of domicile was necessary to decide where a divorce action should have been filed, and in *Walker v. Walker,* 125 Md. 649, 661-665, 94 A. 346 (1915), the domicile of the parties was controlling in deciding whether a divorce decree of another state was entitled to full faith and credit. A number of cases have involved domicile in order to be eligible to file a claim, arising from a motor vehicle accident caused by an uninsured motorist, against the former Unsatisfied Claim and Judgment Fund, *Hawks v. Gottschall,* 241 Md. 147, 152, 215 A. 2d 745 (1966); *Walsh, Adm'r v.*

*Crouse,* 232 Md. 386, 194 A. 2d 107 (1963); *Maddy v. Jones,* 230 Md. 172, 179-180, 186 A. 2d 482 (1962). *Wagner v. Scurlock,* 166 Md. 284, 170 A. 539 (1934), was concerned with domicile because of a statute relating to service of process on non-residents of Maryland in an action based on a motor vehicle accident in this State. Domicile for income tax purposes was an issue in *Comptroller v. Lenderking,* 268 Md. 613, 303 A. 2d 402 (1973). Finally, more than one hundred years ago, this Court dealt with the question of one's domicile in the context of a statute restricting the importation of slaves into Maryland, *Ringgold v. Barley,* 5 Md. 186 (1854). All of these cases, involving many diverse matters, reflect the standard definition of domicile and the same basic principles for ascertaining domicile, regardless of the context.

Moreover, cases involving domicile for one purpose have regularly relied upon cases involving domicile for a totally different purpose. *See, e.g., Bainum v. Kalen, supra,* 272 Md. at 497-498; *Comptroller v. Lenderking, supra,* 268 Md. at 617-620; *Maddy v. Jones, supra,* 230 Md. at 180-182; *Shenton v. Abbott, supra,* 178 Md. at 530-533; *Wagner v. Scurlock, supra,* 166 Md. at 291-293. In sum, domicile has been viewed as a unitary concept in Maryland.

It is true, as the defendant in the present case points out, that the rules for determining domicile may be applied differently because of particular circumstances. For example, where a person votes is ordinarily one of the most important factors a court looks to in resolving the issue of his domicile. *Dorf v. Skolnik, supra,* 280 Md. at 117; *Bainum v. Kalen, supra,* 272 Md. at 498. On the other hand, there may be special circumstances in a particular case explaining why a person did or did not vote in a certain place, revealing that the place of voting in that case was not the best indication of where the person intended his domicile to be. *Gallagher v. Bd. of Elections, supra,* 219 Md. at 200; *Wagner v. Scurlock, supra,* 166 Md. at 292. However, such differences in applying the principles of domicile do not depend upon, or vary with, the purpose for ascertaining domicile or the type of case involved. Rather, the differences arise because of the facts in particular cases.

The very nature of domicile, depending upon one's intent as objectively shown by a multitude of factors associated with that particular individual, will result in differences of application. Moreover, in some contexts there may be special statutory or constitutional requirements in addition to domicile, such as being domiciled in a place for a certain duration. *See, e.g., Bainum v. Kalen, supra; Gallagher v. Bd. of Elections, supra.* But this does not mean that the meaning of domicile itself, or the basic rules for determining it, vary with the context. Regardless of some views expressed by commentators,[8] in Maryland, as in the majority of jurisdictions,[9] the meaning and basic principles for determining domicile do not vary depending on the context.

## (b)

In his final argument, the defendant University President asserts that even if domicile is a unitary concept, G-4 visa holders are incapable of becoming domiciled in Maryland because most nonimmigrants are neither expected nor permitted to remain here indefinitely, G-4 visa holders' salaries are not subject to Maryland income tax, and they cannot vote in Maryland. In our view, none of these circumstances renders a G-4 visa holder incapable, as a matter of law, from becoming domiciled in this State.

The defendant's reliance upon the assertion that most nonimmigrants are neither expected nor permitted to remain in this country indefinitely was effectively undercut by the Supreme Court's opinion in the instant case. The nature of a G-4 visa, as well as the control over immigration generally, is a matter of federal law, *Nyquist v. Mauclet,* 432 U. S. 1, 97 S. Ct. 2120, 2126, 53 L.Ed.2d 63 (1977), and cases there cited. If under federal law a particular individual must leave this country at a certain date, or cannot remain here indefinitely, then he could not become domiciled in Maryland. Any purported intent to live here indefinitely would be

---

**8.** *See, e.g.,* Reese, *Does Domicile Bear a Single Meaning?,* 55 Col. L. Rev. 589, 597 (1955).

**9.** Elkins v. Moreno, 435 U. S. 647, 669 n. 29, 98 S. Ct. 1338, 1351 n. 29, 55 L.Ed.2d 614 (1978), citing Restatement (Second) of Conflict of Laws § 11, Comment o, p. 47 (1971).

inconsistent with law. It would at most be an unrealistic subjective intent, which is insufficient under Maryland law to establish domicile. *Dorf v. Skolnik, supra,* 280 Md. at 116-117; *Bainum v. Kalen, supra,* 272 Md. at 497; *Wagner v. Scurlock, supra,* 166 Md. at 292; *Harrison v. Harrison, supra,* 117 Md. at 614.

However, the Supreme Court in the instant case stated that under federal law, holders of G-4 visas did not have to maintain a permanent residence abroad and did not have to leave this country at a certain date. The Court pointed out that Congress was willing to allow nonrestricted nonimmigrant aliens such as G-4 visa holders "to adopt the United States as their domicile." The Supreme Court went on to say that if a G-4 visa holder developed the "intent to stay indefinitely in the United States, he would be able to do so without violating" federal law or the terms of his visa. The Court concluded by stating that a G-4 visa holder could attain the status of "permanent resident without difficulty." *Elkins v. Moreno, supra,* 435 U. S. at 664-668.

In light of the Supreme Court's interpretation of federal law, it is obvious that nothing inherent in the nature of a G-4 visa would render the holder of such visa absolutely incapable of establishing a Maryland domicile. Assuming the correctness of the defendant's assertion that *most* G-4 visa holders will leave this country, if in a particular case one of these individuals is in a minority and, as shown by objective factors, intends for Maryland to be his fixed place of abode and intends to remain here indefinitely, he will have satisfied the Maryland standard for establishing domicile in this State.

The defendant also relies upon the fact that the salaries of G-4 visa holders from international organizations are exempt from Maryland income tax. It is true that where a person pays taxes is one of the many circumstances which are considered in determining domicile, *Bainum v. Kalen, supra,* 272 Md. at 499. However, "[t]his Court has never deemed any single circumstance conclusive," *Dorf v. Skolnik, supra,* 280 Md. at 117; *Bainum v. Kalen, supra,* 272 Md. at 498. Consequently, of the usual circumstances which are considered under Maryland law to ascertain domicile, no one circumstance will

render a person incapable of establishing a Maryland domicile. Instead, all of the factors relating to the different jurisdictions in question must be examined and weighed. *Dorf* at 117; *Bainum* at 498.[10]

What we have just said is largely dispositive of the defendant's reliance upon the inability of G-4 aliens to vote in Maryland. Although voting and place of residence are generally considered the most important factors in determining domicile, they are not conclusive. *Dorf* at 117; *Bainum* at 498. Moreover, as previously pointed out, there may be special circumstances involved in particular cases showing that the place of voting, or not voting, was not a good indicator of intent regarding domicile and should be given little weight. *Gallagher v. Bd. of Elections, supra,* 219 Md. at 200; *Wagner v. Scurlock, supra,* 166 Md. at 292. Since a G-4 visa holder could not as a matter of law vote in Maryland even if he desired to, his failure to vote here would seem to indicate little concerning domicile.[11] At any rate, this factor itself clearly does not preclude a G-4 alien from becoming domiciled in Maryland.

Since nothing in the general Maryland law of domicile renders G-4 visa holders, or their dependents, incapable of becoming domiciled in this State, the answer to the certified question is "No."

> *Question of law answered as herein set forth.*
> *Appellant to pay costs in this Court.*

---

**10.** In connection with the factor of where one pays taxes, it should be pointed out that G-4 aliens residing in Maryland are subject to Maryland taxes generally, including income tax. However, the portion of their income representing salaries from international organizations is, by treaty, tax exempt. Of course, all treaties made under the authority of the United States are part of the law of Maryland. Constitution of the United States, Art. VI, Cl. 2. In fact, Article 2 of the Maryland Declaration of Rights declares that "all Treaties made ... under the authority of the United States, are ... the Supreme Law of the *State.*" (Emphasis added.) That one has income which is tax exempt as a matter of law is quite different from the factor that has been deemed significant in prior domicile cases, namely to which jurisdiction does he pay taxes. However, we do not now foreclose the possibility that circumstances could be shown whereby a tax exemption, such as exists here, might have a bearing upon one's intent regarding his domicile.

**11.** On the other hand, his continuing to vote elsewhere might be quite significant.